Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4334 | **DATE** | 4/6/2001 |
| **CASE TITLE** | Chemetall GMBH vs. ZR Energy, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Plaintiff's motion to amend the permanent injunction is granted in part and denied in part. Defendants' motion to clarify and limit the scope of the injunction is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 9 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 114 |
| | Copy to judge/magistrate judge. | | 4/6/2001 | |
| | | courtroom deputy's initials | date mailed notice | |
| | JJK | | JJK777777 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CHEMETALL GMBH, | ) | APR 9 - 2001 |
| Plaintiff, | ) | |
| | ) | No. 99 C 4334 |
| vs. | ) | |
| | ) | Magistrate Judge Schenkier |
| ZR ENERGY, INC., JOSEPH T. | ) | |
| FRAVAL, and ARNOLD BERKOVITZ, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 9, 2001, a jury returned a verdict in favor of plaintiff and against all defendants on the claim of misappropriation of trade secrets, in violation of 765 ILCS § 1065, *et seq.* In light of that jury verdict, an injunction preventing continued misappropriation of plaintiff's trade secrets was authorized by 765 ILCS § 1065/3. Accordingly, by an order dated March 12, 2001, the Court promptly issued an injunction barring each of the defendants, and respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them from "making any use of the information that plaintiff acquired from Morton International, Inc. in January 1994 concerning zirconium metal powder, including but not limited to the Morton Product Manufacturing Instructions (the "PMIs") relating to zirconium metal powder and the information contained in those PMIs."

Because the parties had not tendered any proposed forms of injunction order, the Court gave the parties the opportunity to file by March 26, 2001 any motions directed to the propriety or scope of the injunction. Each side has availed itself of that opportunity: plaintiff filed a motion to amend the permanent injunction, and defendants filed a motion to clarify and limit the scope of the

injunction order. Each side submitted with its motion a proposed form of injunction order. During a hearing on March 29, 2001, the Court provided the parties with the Court's preliminary views concerning the matters raised in the competing motions. At that time, the Court invited the parties to file simultaneous responses addressing the Court's comments and the matters raised in the motions by April 3, 2001 (the Court ordered expedited briefing in response to defendants' stated concern regarding its ability to survive for long under the March 12, 2001 injunction order). Upon reviewing these submissions, on April 5, 2001 the Court conducted a further in-court proceeding to obtain additional input from the parties as to certain aspects of their proposed injunction orders.

The parties agree that the injunction order needs to be amended, and they even agree – more or less – on certain revisions to be made. But they strongly disagree about many important aspects of the proposed revisions. In particular, the parties have staked out diametrically opposed positions as to what constitutes the plaintiff's trade secret that is entitled to be protected by an injunction: plaintiff claims that 15 particular pieces of equipment or elements of the manufacturing process set forth in the Morton PMIs constitute the trade secret; defendants claim that none of those 15 items or elements is a trade secret. In addition, the parties seriously disagree about the circumstances under which the defendants should be allowed to resume making and selling zirconium metal powder ("ZMP"); the proper disposition of ZR Energy's existing inventory of ZMP; whether there should be inspections to monitor defendants' compliance with the injunction and, if so, the manner and frequency with which they should be conducted; and the nature and scope of the notice of the injunction that is to be provided.

Based on the motions and the briefs, the comments received from the parties in open court on April 5, 2001, and the Court's knowledge of the evidence adduced at trial, the Court concludes that neither side's proposal accurately captures what constitutes the trade secret that is entitled to

protection or what provisions the injunction should contain to fairly protect that trade secret. In the Court's view, defendants' proposal seeks to deny what the jury plainly found: that defendants violated plaintiff's trade secret rights. But plaintiff's proposal overreaches in the other direction, by seeking to stretch its trade secrets farther than the evidence warrants.

Accordingly, the Court today adopts an amended injunction order, which is in the form attached to this Memorandum Opinion and Order (without appendices). In the balance of this opinion, the Court explains why it finds that this amended injunction order fairly reflects, and protects, plaintiff's trade secret rights.

## I.

The injunctive relief issued in a trade secret case must be tailored to the facts of the case and must be sufficient to protect the interests of the trade secret holder. *E.g., Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1121 (Fed. Cir. 1996); *Abreu v. Unica Indus. Sales, Inc.*, 586 N.E.2d 661, 672 (Ill. App. Ct. 1st Dist. 1991). At the same time, the injunction "should not go beyond the need to protect the legitimate interests of the plaintiff and should not unduly burden the defendant." *Stempede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 219 (Ill. App. Ct. 1st Dist. 1995).

Nowhere is this need for balance more critical than in assessing the threshold question of what constitutes the trade secret that plaintiff is entitled to protect. Construing the trade secret too narrowly would deprive the plaintiff of the ability to fairly protect its property. But, construing the trade secret too broadly would accord plaintiff protection beyond its legitimate interests and run the risk of unnecessarily stifling competition. Guided by these principles and its review of the evidence, the Court rejects the "all or nothing" approach advocated by each side on the question of what constitutes plaintiff's trade secrets.

3

The defendants argue that none of the fifteen elements from the Morton PMIs for making ZMP, listed in plaintiff's trial exhibit 135 ("PX 135"), is a trade secret. In aid of this argument, defendants claim that the jury did not find that any of those elements constituted a trade secret (Defs.' Motion at 4-5). However, the jury was instructed that it could find for plaintiff on the trade secret claim only upon determining (not surprisingly) that plaintiff possessed a trade secret. *See* Jury Instruction No. 15. The jury then was given detailed instructions on how to determine whether the plaintiff possessed trade secret information. *See, e.g.*, Jury Instructions Nos. 16-20. Defendants' suggestion that the jury returned a verdict for plaintiff on the trade secret claim without finding that plaintiff possessed a trade secret is therefore not tenable.

Conversely, the Court does not accept plaintiffs' suggestion that the jury verdict establishes, *ipso facto*, that all of the fifteen elements list in PX 135 are trade secrets. As defendants correctly point out (Defs.' Motion at 4), the jury verdict does not identify which elements the jury believed were entitled to trade secret status. To be sure, plaintiff's evidence, summarized in PX 135, indicates that the ZR Energy process replicated the 15 elements of the Morton process. But the basis for the injunction sought here is not that defendants copied elements of the Morton process (and thus breached some contractual arrangement); rather, it is that the elements copied by defendants are trade secrets. Thus, the evidence of copying does not answer the question of whether the elements copied are trade secrets.

Nor are we persuaded by plaintiff's contention (Pl.'s Suppl. Mem. at 2) that analyzing each element separately would improperly focus on the trees (the constituent elements of the process) at the expense of losing sight of the forest (the "essential process"). Although the fifteen elements may, as plaintiff suggests, be likened to the trees in a forest, that does not answer the question of whether

4

each tree is entitled to trade secret protection. In that regard, we note that plaintiff's current argument that all 15 elements must be viewed as inseparable parts of the trade secret is not the approach that plaintiff espoused in the injunction order it proposed on March 26. At that time, plaintiff eliminated two elements – Element Nos. 7 and 12 from PX 135 – from the list of process elements that it proposed defendants should be barred from using. Plaintiff's initial approach was thus the same as that the Court now pursues: examining each element critically, to see if it is entitled to trade secret protection, rather than lumping them all together into an undifferentiated whole. While plaintiff may have decided to change course, the Court declines to follow.[1]

A trade secret is "information that is sufficiently secret to derive actual or potential economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and which is protected by reasonable efforts." *See* Jury Instruction No. 16. Using this definition, the Court considers what constitutes plaintiff's trade secrets in this case by looking not at the fifteen elements as an undifferentiated whole, but as to the role that each plays in the essential process developed by Morton (and acquired by Chemetall) for manufacturing ZMP. Based on the Court's assessment of the evidence, many aspects of the fifteen steps listed in PX 135 are not trade secrets.

In reaching this determination, the Court draws a general distinction between the implements

---

[1] The authority cited by plaintiff does not support the approach it currently proposes. Plaintiff cites to Jury Instruction No. 23, which states that in order "[t]o find trade secret misappropriation, you do not have to find that defendants copied or used each and every element of the trade secret." This instruction merely told the jury that defendants could commit a trade secret violation by copying some (but not every) portion of plaintiff's trade secret; it did not tell the jury that it had to find each and every element of plaintiff's process to constitute a trade secret. The case cited by plaintiff, *Mangren Research and Dev. Corp. v. National Chemical Co., Inc.*, 87 F.3d 937, 944 (7th Cir. 1996)(Pl.'s Suppl. Mem. at 2), illustrates this point. There, the Court stated that the trade secret is not necessarily the overall formula, but can be the "essential secret ingredient." That is exactly the case here: as explained below, we find that plaintiff's trade secret is not the totality of the 15 elements listed on PX 135, but instead the four "essential" elements of that process.

used to create a product and how those implements are manipulated to create the product. In other words, there is a difference between the raw materials and the equipment used to make ZMP, and the process used that combines those raw materials in the equipment to create the final product. Based on this distinction and the evidence adduced at trial, the Court finds that the essential process steps that constitute a trade secret in this case include Element Nos. 3, 6, 8, and 10 from PX 135.[2] The Court finds that these elements are essential, and secret, process elements developed and calibrated by Morton to produce ZMP having specific qualities and properties. The testimony of Dr. Bick indicates that these elements in the process are critical to making the product safely, as well as ensuring that the ZMP has a certain level of purity and burns in a particular fashion (Trial Tr. 429-432). Moreover, the testimony does not indicate that Element Nos. 3, 6, 8, and 10 were in the public domain – at least, not in the specific manner in which Morton used them. To the contrary, information in the public domain suggested that at least one aspect of the process as developed by Morton would not work (*see* PX 6, at 29-30).

On the other hand, the Court finds that Element Nos. 1, 2, 4, 5, 7, 9, 11, 12, 13, 14, and 15 summarized on PX 135 are not trade secrets. For example, the identity of the raw material supplier (Element No. 1) is public information (*see, e.g.,* PX 6, at 10-13), and the evidence does not establish to the Court's satisfaction that the source of the raw material is so critical to the process as to warrant trade secret status. Similarly, the equipment used in the Morton process to blend (Element No. 2),

---

[2]Mindful that this Memorandum Opinion and Order will be a public document, and in deference to plaintiff's understandable desire to preserve the confidentiality of the information that the Court finds is a trade secret, we will refer to the claimed trade secret elements by referring to the numbered list found in PX 135, without discussing the specifics of each element in the process. Thus, the Court expects that this discussion, while necessarily oblique, will be understandable to the parties, although it may not be fully so to other readers who do not have access to the briefs, the trial testimony, and the exhibits.

6

process (Element Nos. 4, 5, 7, 9, and 11), and prepare the material for packaging (Element Nos. 12, 13, 14, and 15) is commonly known in the industry and readily available in the market (*see, e.g.,* Trial Tr. 941 (Element Nos. 2); Trial Tr. 943 and Wojciechowski Dep. 79 (Element Nos. 4 and 5); and 96 (Element Nos. 13 and 14)). Many of the differences between the Morton process and that reflected in the Eagle Picher report (*e.g.,* Element Nos. 7, 9, 11, 12, 13, 14, and 15) merely reflect the natural and foreseeable implementation of a manufacturing process to produce sufficient quantities of ZMP to sell in the market place to make a profit, and do not reflect secret information. Indeed, some of these items of equipment (Element Nos. 7 and 12) are ones that plaintiff initially deleted from the list of process elements it sought to include in the injunction order – no doubt because it recognized that these elements do not command trade secret status.

The Court does not hold that the materials and equipment used for the manufacturing process can never be a trade secret. Certainly, if the materials and equipment were designed to specifications derived by Morton for making a certain quality of ZMP, trade secret protection might be in order. *See, e.g., General Electric Co. v. Sang,* 843 F. Supp. 776, 778 (D. Mass. 1994) (use of 5,000 ton apparatus and specifications for its operation barred by permanent injunction where the apparatus was specially designed for the trade secret technology). But there is no evidence that this is the case here, and thus to bar the use of that equipment and material would improperly bar lawful activity. *See generally Cloer v. Gynecology Clinic, Inc.,* 528 U.S. 1099 (2000) (the scope of an injunction held overly broad because it was not limited to barring acts that were unlawful). The skill and knowledge that Morton brought to the manufacturing of ZMP was the way to take publicly-available materials and equipment, and to manipulate them through a process to create a specific product. The Court concludes that Elements Nos. 3, 6, 8 and 10 represent that skill and knowledge, and are

7

protectible as trade secrets; the other elements in the process are not.

## II.

The Court has fashioned an amended injunction order that protects plaintiff's legitimate trade secret interests, without going farther than the Court deems necessary. The amended injunction order prohibits defendants (as broadly defined in Rule 65) from using any of the process elements that the Court has found to constitute trade secrets in the manufacture of ZMP, or from possessing, using, or disclosing in any way that information (Am. Inj. Order ¶¶ 1, 3). In furtherance of this prohibition, defendants are required to certify that they have destroyed documents, including any of their own documents, that incorporate the trade secret information, and that they have retained no copies (*Id.*, ¶ 4). A limited exception to this destruction requirement is made so that defendants' trial counsel may retain copies of such documents for purposes of post-trial proceedings and appeals in this case (*Id.*). These provisions are substantially similar to the provisions proposed in paragraphs 1, 3, 4 and 5 of plaintiff's proposed order. The Court declines to impose a requirement of return of documents, as proposed in paragraph 2 of plaintiff's proposed order, as that is unnecessary in light of the destruction requirement.

The amended injunction order will require the defendants to make changes in their operation if they are to continue in the ZMP business. The Court discusses below the provisions that address (a) the requirement that defendants alter their ZMP process if they are to remain in that line of business; (b) the disposition of defendants' current inventory of ZMP made using its current process, which utilizes plaintiff's trade secret information; and (c) future monitoring to ensure compliance with this amended injunction order.

## A.

The Court has made it clear that the injunction does not bar defendants from engaging in the business of manufacturing or selling ZMP; but it does prohibit them from doing so by using the information that constitutes plaintiff's trade secret (Am. Inj. Order ¶ 5). Each side has asked the Court to specify the details of the changed ZMP process that defendants may adopt. For the reasons that follow, the Court declines to do so.

Although Paragraph 7 of plaintiff's proposed injunction order is not so limiting, plaintiff's brief makes clear that it asks the Court to limit the defendants to producing ZMP in precisely the way disclosed in the Eagle Picher report. The Court does not find that this limitation is warranted by the evidence. There is no evidence that the Eagle Picher report constitutes the sole source of public domain information, and indeed, the Court finds that certain aspects of the plaintiff's process is not a trade secret.

However, the Court also will not acquiesce in defendants' request to bless, in advance, certain changes as sufficient to allow them to resume ZMP production. The jury in this case found that defendants created their business by taking plaintiff's trade secret information. Defendants' improper use of plaintiff's trade secret information allowed the defendants to truncate the time that otherwise would have been required, through experimentation and adjustment, to arrive at a process that yielded a product they could take to the marketplace. Part of the purpose of the injunction is to strip defendants of the advantage they improperly obtained, and to require them to develop their own manufacturing process without using plaintiff's trade secrets. By asking the Court to tell them how to change their process to allow future production, defendants are in effect seeking to avoid having to undergo that independent development process, and thus to perpetuate that improperly-obtained

benefit. For this reason, the Court rejects defendants' request.

We believe that the Court's discussion identifying what constitutes plaintiff's trade secret provides the defendants with sufficient guideposts as to what must be changed in their process if they are to resume manufacturing ZMP. The defendants will be left to their own devices to develop a new process that is independent of, and does not utilize, plaintiff's trade secrets. The evidence shows the sensitivity of ZMP to changes in the manufacturing process, and that customers impose strict specifications on the quality of ZMP given the use to which the product is put. For this reason, the Court does not anticipate that defendants could reasonably put a new process into place overnight.

Thus, in order to diminish the incentive for defendants to make hasty, surface changes in order to resume marketing ZMP quickly, Paragraph 5 of the amended injunction order prohibits defendants from re-entering the market using ZMP produced through a new process for a period of 180 days from the date of this order. When the defendants believe they have developed a new process which does not utilize the plaintiff's trade secret information (whether before or after that 180-day period), the defendants will notify the Court and plaintiff's counsel. At that time, an inspector, designated by the Court pursuant to Paragraph 6 of the amended injunction order, will inspect the new process. We reject plaintiff's suggestion that counsel be permitted to attend the inspection. The inspector will submit a written report to the Court (with copies to plaintiff's and defendants' counsel) stating and explaining his or her opinion as to whether the new process utilizes the plaintiff's trade secret information, as defined in this opinion and in the amended injunction order. Upon receiving the inspector's reports, and any comments from counsel concerning the report, the Court will enter a ruling as to whether the defendants will be free to resume the

manufacture and sale of ZMP utilizing the new process.

**B.**

Under Paragraph 2 of the amended injunction order, the defendant may not sell, but must preserve, its existing inventory for a period of 180 days from the date of this order. The defendant has alleged that it currently has in storage 1315 lbs. of ZMP.[3] That existing inventory is to be segregated and identified in a manner that ensures it will be kept separate from any ZMP that might be produced pursuant to a new process that defendants may develop.

The defendants ask that they be allowed to sell its current inventory at the present time, while they develop a new manufacturing process, in order to satisfy existing contractual requirements. According to defendants, the current inventory would be sufficient to meet about three months worth of the contractual production requirements. However, the Court believes that to accede to this request would be improper. The jury verdict establishes that this inventory was produced through a process that was built upon defendants' improper use of plaintiff's trade secret information. To allow defendants to sell off this inventory while developing a new process would allow defendants to continue to enjoy the benefits of that improper action.

The Court will entertain a request by defendants to sell the existing inventory at the conclusion of the 180-day period. The Court would consider permitting sales at that time in order to allow defendants to recover costs and to avoid possible environmental complications that would be created by the need to dispose of the ZMP. The Court contemplates that any sales of the existing inventory would be conditioned on the defendants paying plaintiff a royalty fee for every pound of

---

[3]This number is a downward revision from the 2500 lbs. of ZMP claimed by defendant in its supplemental brief submitted on Tuesday and represented to the Court on Thursday afternoon. However, given defense counsel's explanation of the revision, the Court accepts it at face value and incorporates that revision into its order.

11

ZMP sold, to ensure that defendants did not improperly profit from the sale. *See generally Integrated Cash Management v. Digital Transactions, Inc.*, 920 F.2d 171, 175 (2d Cir. 1990). However, the parties' current proposals as to the appropriate royalty both seem extreme (albeit in different directions). Thus, in the event that defendants later seek to sell the inventory, the Court will require a more complete presentation as to defendants' costs in order to determine an appropriate royalty.

## C.

The Court has put into place an inspection procedure that will be in effect for two years from expiration of the 180-day period for developing a new process, and provides for inspections on 24-hour notice (Am. Inj. Order ¶ 6). The Court's inspection provision modifies the plaintiff's proposal in several important respects.

*First*, the Court has shortened the period for inspections to two years, from the three years proposed by plaintiff. The Court views this shorter period as sufficient, in light of the fact that no sales will occur during the next 180-day period and manufacturing and sales may resume thereafter only upon an inspection and Court order permitting it.

*Second*, the Court has ordered that inspections will be conducted by an inspector selected by the parties (or by the Court, if the parties cannot agree), and that the inspector's reports will be provided to the Court and to trial counsel on an attorneys' eyes only basis. This procedure departs from the inspections plaintiff proposed to be conducted by plaintiff's counsel and one of its company representatives. The Court's modification of this proposal eliminates plaintiff from having the ability to view its competitor's production processes, some of which may be proprietary to defendants, while at the same time providing a suitable means for monitoring compliance.

*Third*, the Court has limited the inspections that may be conducted each year to four. The Court sees no need for an unlimited number of inspections, as plaintiff proposes.

*Fourth*, the Court has specifically provided that, except for the cost of the initial inspection by Paragraph 5 of the amended injunction order (which will be borne by defendants), plaintiff will bear the cost of the inspector's periodic services in the first instance. However, the amended injunction order provides that if the inspection reveals a violation of the order, then the cost of the inspection will be shifted to the defendants.

We do not find any merit in the suggestion in Paragraph 10 of plaintiff's proposed order that defendants be required to supply to plaintiff a sample of any ZMP that meets new specifications that defendants' ZMP did not previously meet. It is unclear how that would assist in uncovering violations of the amended injunction order: the Court fails to see how meeting new specifications would show that defendants were still using plaintiff's trade secret information. In any event, the Court finds no need for this provision in light of the inspection program that has been put into place.

We also have considered defendants' argument that no inspections should be required at all, since it should not be assumed that the injunction will be violated. In ordering a monitoring process, the Court does not assume that there will be intentional violations. Nonetheless, the Court believes that a monitoring process will be useful in ensuring that if any violation occurs (even if unintentional), it will be detected and corrected promptly. And the inspection program has been devised so as to minimize the inconvenience to defendants, to prevent plaintiff from having access to any proprietary information from defendants, and to take place at no cost to defendants – so long as there are no violations of the amended injunction order.

13

## III.

There are several other provisions that the Court mentions briefly. The Paragraph 8 of the amended injunction order provides for the Court to exercise continuing jurisdiction to enforce the injunction and to adjudicate issues arising under it. We do not believe it is necessary, as plaintiff proposes in Paragraph 12 of its proposed order, to specify just what issues those proceedings might involve.

The Court also has provided for defendants to give notice of the injunction, by providing a copy of it (without attachments). Contrary to defendants' assertion (Defs.' Resp. at 9), the Court does not believe that such notice constitutes "double compensation" to plaintiff, but instead is necessary to ensure that all those who might be bound by the injunction under Rule 65 are bound, and the requirement that the notice be given by providing a copy of the amended injunction order ensures that customers will receive accurate information about the limitations under which ZR Energy is operating.

Finally, the Court rejects defendants' request (*see* Defs.' Motion at 6 and Defs.' proposed injunction order) for a preamble to the amended injunction order stating that the purpose of the injunction is not to put the defendants out of business. In fashioning this amended injunction order provision, the Court acts neither from a desire to ensure that defendants remain in business, nor from a desire to put them out of business. Rather, the Court has focused on what it considers to be the appropriate function of the injunctive relief authorized by the Illinois Trade Secret Act: to eliminate the unfair advantage that defendants' gained by using plaintiff's trade secret information. If defendants can conduct their business without using plaintiff's trade secrets, then they have the right to do so; but if they cannot, then they have no right to continue in the ZMP business.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to amend the permanent injunction is granted in part and denied in part; defendants' motion to clarify and limit the scope of the injunction is granted in part and denied in part. The Court today enters an amended injunction order in the form attached to this Memorandum Opinion and Order (without appendices). The parties shall submit to the Court by April 30, 2001 the name of an inspector that they agree should conduct the inspections required by Paragraph 5 of the amended injunction order; if agreement cannot be reached, by that date the parties shall submit a list of names (with resumes) of the individuals they separately propose to discharge the task of inspector.

**ENTER:**

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: April 6, 2001