# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4334 | **DATE** | 9/14/2001 |
| **CASE TITLE** | Chemetall GmbH vs. ZR Energy Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Order and Opinion. For the reasons set forth within: Defendant's motion for a judgment as a matter of law or, alternatively, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110) is denied. Plaintiff's motion to amend the judgment to include prejudgment and post-judgment interest (doc. # 144) is granted in part. The judgments against ZR Energy, Mr. Faval and Mr. Berkovitz on the trade secret claim are increased to \$139,667.88, 2,133.16 and 4,266.33, respectively, to include prejudgment interest to March 12, 2001. Post-judgment interest shall accrue on the judgments against ZR Energy and Mr. Berkovitz at the rate of \$16.13 and \$.3980 per day, respectively, from March 12, 2001. In all other respects, the motion is denied. Plaintiff's bill of costs is granted in part and denied in part. Plaintiff is awarded \$26,102.07 in taxable costs under Rule 54(d).

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | SEP 1 8 2001 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | 145 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | | 9/14/20017 | |
| mm | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

EC-7
FILED FOR DOCKETING
01 SEP 17 AM 11: 43



DOCKETED

SEP 18 2001

CHEMETALL GMBH,  )
                                       )
       Plaintiff,  )
                                       )     Case No. 99 C 4334
   v.  )
                                       )     Magistrate Judge Schenkier
ZR ENERGY, INC., JOSEPH T. FRAVAL,  )
and ARNOLD BERKOVITZ,  )
                                       )
      Defendants.  )

## MEMORANDUM OPINION AND ORDER

On March 9, 2001, a jury returned a verdict awarding compensatory damages against defendants ZR Energy, Inc. ("ZR"), Joseph T. Fraval and Arnold Berkovitz for trade secret misappropriation; punitive damages against Mr. Berkovitz for willful and malicious trade secret misappropriation; and compensatory damages against Mr. Fraval for breach of contract. On March 12, 2001, the Court entered judgment on those verdicts. All defendants have moved for judgment as a matter of law or, in the alternative, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110). For its part, plaintiff Chemetall has moved for prejudgment and post-judgment interest (doc. # 144), and for an award of costs (doc. # 117). For the reasons set forth below, (a) defendants' motion for judgment as a matter of law or new trial is denied; (b) Chemetall's motion for prejudgment and post-judgment interest is granted in part; and (c) Chemetall's bill of costs is granted in part.

*145*

# I.

We address the Rule 50 motions first. Rule 50 states in pertinent part:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment–and may alternatively request a new trial or join a motion for new trial under Rule 59.

Fed.R.Civ.P. 50(b). The plaintiff argues that the defendants have waived their Rule 50 motion and, alternatively, that the evidence was sufficient to support the jury's verdicts on their claims. We address these arguments in turn.

## A. Waiver.

The plain language of Rule 50(b) requires a party to move for judgment as a matter of law "at the close of all the evidence" to preserve the right to make such motion after trial. The reason for requiring a party to renew a motion for judgment as a matter of law at the close of all the evidence is "to enable the trial court to re-examine the sufficiency of the evidence . . . and to alert the opposing party to the insufficiency of his case" before the case goes to the jury. *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 472 (5th Cir. 2000). The Seventh Circuit strictly adheres to this requirement. *See, e.g., Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1000 (7th Cir. 1997) ("In *Umpleby*, we ruled unequivocally that in order to preserve a motion for judgment as a matter of law which was not granted by the trial court, the motion must be renewed at the close of all the evidence"); *Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 212 (7th Cir. 1995) ("In order to preserve its motion for judgment as a matter of law, P&B had to renew its motion at the close of all the evidence"); *see also Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132,

1139-40 (7th Cir. 1994) (noting that the practice of not applying this requirement "rigidly" was abandoned in light of the 1991 amendments that make clear the rule is to be applied strictly).

Defendants' Rule 50(b) motion challenges the jury's finding of liability and award of compensatory damages for trade secret misappropriation, the jury's assessment of punitive damages against Mr. Berkovitz, and the jury's finding of liability and award of compensatory damages against Mr. Fraval for breach of contract. Chemetall argues that defendants' Rule 50(b) motion is barred as to all claims, because defendants failed to make the requisite Rule 50(a) motion at the close of all the evidence.

## 1.

Mr. Fraval and ZR Energy concede that they did not move for judgment as a matter of law at the close of all the evidence as to Chemetall's claim of liability and compensatory damages on the trade secret claim. Defendants argue that it would have been superfluous – and, indeed, "silly" (Defs.' Reply Mem. at 4) – to do so because of the Court's ruling on Chemetall's Rule 50(a) motion at the close of defendants' case. Defendants contend that in denying Chemetall's Rule 50(a) motion, and referring to the denial of the Rule 50(a) motions defendants made at the end of plaintiff's case, the Court "effectively renewed its denials" of defendants' Rule 50(a) motions and thus made further defendants' defense motions "pointless" (Defs.' Reply at 4, 9) (citing Trial Tr. at 1017, 1018).[1]

---

[1] The Court's comments and rulings in response to Chemetall's motion for judgment as a matter of law upon which defendants rely are set forth below:

> For the reasons I expressed yesterday when the defense made its motion for a judgment as a matter of law on Count I, I deny the [plaintiff's] motion. As I said yesterday, I think there is evidence which if accepted by the jury could lead them to draw the conclusion [that a trade secret existed and had been misappropriated by the Defendants].
>
> * * *
>
> And for the reasons I have already expressed on the record I think both yesterday when the defense

Thus, defendants contend that their "post-trial motions relating to [d]efendants Fraval and ZR Energy have not been waived because the purposes of Rule 50 have been fulfilled" (Defs.' Reply Mem. at 7). In support of this argument, the defendants argue that the Seventh Circuit does *not* always "strictly adhere" to Rule 50, but has allowed "a more flexible approach," putting "the substance of Rule 50 ahead of its form when equity demands it" (Defs.' Reply at 3, n.2) (citing *Pro Football Weekly, Inc. v. Gannett Co.,* 988 F.2d 723, 726 (7th Cir. 1993) and *Urso v. United States,* 72 F.3d 59, 61 (7th Cir. 1995)).

The Court disagrees that, in this case, the purposes of Rule 50 were served in the breach. The Advisory Committee Notes to the 1991 amendment to Rule 50 explain that the requirement of making the motion at the close of all the evidence "assure[s] the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." In addition, the requirement serves "as a means of defining the appropriate issue posed by the post-verdict motion," since "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." The Court's comments in denying Chemetall's motion for judgment as a matter of law did not satisfy these purposes, and thus defendants could not have fairly relied on those comments as a license to refrain from making their own Rule 50(a) motion at the close of all evidence. Nor were the Court's comments intended to preempt defendants from making a renewed Rule 50(a) motion, since the Court had no idea whether defendants would make a motion or, if so, what grounds they might advance in support of a renewed

---

moved for judgment as a matter of law on that [breach of contract] claim and during the various instruction conferences we have had, I am going to deny that motion [by plaintiff for judgment on the breach of contract claim].

4

motion. And, indeed, even defendants did not view the Court's comments as preempting a renewed Rule 50(a) motion, because (as explained below) they specifically made one on behalf of Mr. Berkovitz on the trade secret claim.

The situational exceptions to strict adherence to this procedural prerequisite, as noted by *Pro Football* and *Urso*, are very narrow and inapplicable here. In *Pro Football,* the Seventh Circuit held that the purposes of Rule 50 were served when the trial judge, after taking argument on an issue at an instruction conference, specifically informed the parties that it considered defendant's argument at that conference to be a motion for directed verdict at the close of the evidence and would take that motion under advisement. In that case, the Seventh Circuit found that an additional, formal motion made in court "at the close of all the evidence" would have been superfluous and unnecessary. 988 F.2d at 726. Here, the Court did not make any such statement to the defendants. The decision in *Urso* is also distinguishable. There, the motion for judgment on a matter of law was made at the close of all the evidence, but the grounds for it were not specified. 72 F.2d at 61. Here, by contrast, ZR Energy and Mr. Fraval made no renewed motion at all.

Given the clear law in this Circuit requiring that Rule 50(a) motions be made at the close of all evidence in order to preserve a Rule 50(b) motion after trial, prudence should have dictated that ZR Energy and Mr. Fraval make a renewed motion on the trade secret claim. They did not do so, and as a result, their Rule 50(b) motion on that claim is waived.

## 2.

Defendants argue that even if the Rule 50(b) motion on trade secret misappropriation was waived as to defendants ZR Energy and Fraval, the motion was preserved as to Mr. Berkovitz. At

the close of all the evidence, defense counsel moved for a judgment as a matter of law as to Mr.

Berkovitz, alone, on the basis that there had been no evidence of a knowing misappropriation:

> Mr. Griffin: Judge, if I may, we have one motion. I don't believe that the general knowledge of ZR, which Mr. Fraval's knowledge could be imputed to, but general knowledge of ZR cannot be imputed to Mr. Berkovitz, nor can Mr. Fraval's knowledge be imputed. There is no evidence to sustain a claim for trade secret misappropriation against Mr. Berkovitz. There has been nothing that is adduced showing his knowing efforts of misappropriation of trade secrets. We move for a directed verdict on that issue.

(Trial Tr. at 1019). Mr. Berkovitz asserts that this motion was sufficient to preserve his post-trial

challenge to the trade secret verdict against him, both for compensatory and punitive damages.

We agree that this motion preserved Mr. Berkovitz's present post-trial challenge to the

punitive damages award. Mr. Berkovitz's motion at the close of all the evidence expressly sought

judgment as a matter of law based on his lack of knowing conduct. In his post-trial motion, Mr.

Berkovitz seeks judgment as a matter of law on the punitive damages claim on the theory that the

evidence did not permit the jury to find his conduct willful and malicious (Defs.' Mem. at 7-12), a

motion that likewise challenges the sufficiency of the evidence concerning his mental state. Mr.

Berkovitz's motion at the close of all evidence concerning whether he had the mental state necessary

to be liable for trade secret misappropriation subsumed the question of whether, if liable, his mental

state was such that he should be assessed punitive damages as well, and thus preserved his challenge

to the punitive damages award.

However, a different question is presented with respect to whether Mr. Berkovitz's motion

at the close of all evidence was likewise sufficient to preserve his post-trial motion challenging the

sufficiency of the evidence to establish that he committed a trade secret violation. That is because

Mr. Berkovitz's current challenge is based on a ground (lack of proof that there was a trade secret

at all) that was not argued in Mr. Berkovitz's motion at the close of all evidence. Mr. Berkovitz's oral motion at the close of all the evidence raised one point only – his purported lack of knowing conduct. The statement that "[t]here is no evidence to sustain a claim for trade secret misappropriation" does not refer to evidence concerning whether there was a trade secret, but rather must be read in context with the preceding and following sentences, which focus solely on the question of knowing conduct by Mr. Berkovitz.

Rule 50(a)(2) states that the motion "shall specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." The commentary to Rule 50 states that this articulation of the basis for a pre-verdict motion for judgment as a matter of law "is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof." Advisory Committee Notes to 1991 Amendment. And, no doubt, that is why the Committee Notes state that a "post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." *Id.* (citing *Kutner Buick, Inc. v. American Motors Corp.*, 848 F.2d 614 (3d Cir. 1989)). That purpose would not be achieved if a party could seek a pre-verdict judgment as a matter of law on one ground, and then seek a post-verdict judgment as a matter of law on a different ground. That is what Mr. Berkovitz seeks to do here with respect to the jury award of compensatory damages on the trade secret claim. Accordingly, Mr. Berkovitz's motion attacking the jury verdict of liability and compensatory damages on the trade secret claim has been waived.

**3.**

Mr. Fraval seeks judgment as a matter of law on the jury's verdict holding him liable for compensatory damages on the plaintiff's breach of contract claim. Mr. Fraval argues that there was no evidence that he owed a duty of confidentiality to plaintiff by virtue of his employment agreement with Morton, or the Asset Purchase Agreement between Morton and Chemetall. Specifically, Mr. Fraval argues that the duty of confidentiality he owed to Morton was not assigned to Chemetall, and thus he could not be held liable for a breach of contract to plaintiff (Defs.' Mem. at 13-15).

At the close of plaintiff's case, defense counsel made the following motion for judgment as a matter of law on the trade secret and breach of contract claim:

> *Mr. Griffin:* The -- and I am not going to get into long detailed analyses. I'm not going to argue the law. The only point I'm arguing, and it's on both the breach of contract and on the trade secrets count is that there has been no evidence introduced -- and remember, the plaintiffs withdrew their submission of their expert -- that the process utilized by ZR Energy was derived from the process at Morton. There is no credible evidence on that. The only evidence that's been submitted is that it was adduced from the Eagle-Picher report and modified by defendants.
>
> *The Court:* . . . I will tell you that on the trade secret and the contract claim I will take the motion -- I am not going to take it away from the jury. I think that there is evidence here that the jury ought to be entitled to decide.

(Trial Tr. at 814, 815). Plaintiff does not deny that the defendants made this motion at the close of plaintiff's case. However, the plaintiff argues that once denied, this motion was not sufficient to preserve Mr. Fraval's post-trial Rule 50 motion on the breach of contract issue, because the motion was not renewed at the close of all the evidence.

We agree. The Court's denial of Mr. Fraval's motion at the close of Chemetall's case, even if an accurate prediction of how it would rule on the Rule 50 motion at the close of the evidence (*i.e.*, that the jury ought to be entitled to decide the issue), did not obviate the need for Mr. Fraval to renew

8

the motion, thereby apprising plaintiff and the Court of his intention to preserve the legal issue for

post-trial consideration. That is particularly so, given that the issue raised in Mr. Fraval's post-trial

motion (that the evidence failed to establish that he had a duty of confidentiality that transferred from

Morton to Chemetall) is different than the challenge he raised in the motion at the close of plaintiff's

case (that there was insufficient evidence of a trade secret).

Defense counsel argues, however, that the following motion, made after closing arguments,

is sufficient to preserve Fraval's Rule 50(b) motion on the breach of contract verdict (Pl.'s Resp. at

5):

> *Mr. Griffin:* Judge, I would like to, at least for the record, make a formal motion at this point, based on the closing statements and the fact that plaintiff has not identified to the jury any causation damages for the contract count and didn't ask for any damages with respect to the contract count, that that be directed out in favor of defendant Fraval.
>
> *The Court:* I'll deny that motion. The evidence is in the record, and all attorneys choose which evidence they are going to specifically highlight and argue. So I'm not going to convert that into a ruling as a matter of law.

(Trial Tr. at 1134).

Mr. Fraval's motion fails to preserve his current post-trial attack on the breach of contract

verdict not only because it did not raise the grounds now urged by Mr. Fraval, but it also came too

late. Rule 50(a)(2) requires that a pre-verdict motion be made "before submission of the case to the

jury." Here, the "formal motion" that Mr. Fraval made "for the record" on the contract claim came

only after the lawyers argued to the jury, the Court gave its instructions of law, and the jury was sent

out to commence its deliberations. A motion made so late plainly does not preserve a post-trial

motion. Thus, Mr. Fraval's Rule 50(b) challenge to the verdict on the contract claim is waived.

## B. Sufficiency of the Evidence.

The parties agree that when assessing the sufficiency of the evidence under Rule 50, the standard is whether any rational (or reasonable) jury could find for the plaintiff (Pl.'s Resp. at 6-7; Defs.' Reply at 3, n.1). *See Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 335 (7th Cir. 1994); *Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 630 (7th Cir. 1996).[2] In the interest of completeness, the Court will address both the one Rule 50 challenge that has been preserved (attacking the punitive damages award), and those challenges that have been waived.

### 1.

The defendants' primary attack on the trade secret claim was that the plaintiff's zirconium metal powder manufacturing process ("ZMP process") is not proprietary information that constitutes a trade secret, because "much" of this process has been "available in the public domain for many years in the form of a report known as the Eagle-Picher report" – long before plaintiff acquired its ZMP process from non-party Morton International ("Morton") (Defs.' Mem. at 4). The defendants' attack rests on the notion that because many of the same elements in the ZMP process used by plaintiff are present in the process outlined in the Eagle-Picher report, the plaintiff's process is not a trade secret and thus could not be misappropriated by ZR Energy (Defs.' Mem. at 4-5). In the Court's view, defendants' argument misconceives both Chemetall's burden of proof, and the evidence introduced at trial.

---

[2]The plaintiff correctly points out that the standards governing defendants' Rule 50 motion are supplied by federal, rather than state, law. *Compare* Defs.' Mem. at 3 and Pl.'s Resp. at 6 (citing *Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 335 (7th Cir. 1994)). The defendants contend that they are entitled to judgment as a matter of law, regardless of whether Illinois or federal law applies, because no reasonable jury could have found for the plaintiff (Defs.' Reply at 3, n.1). *Cf. C&F Packing Co., Inc. v. IBP, Inc.*, 224 F.3d 1296, 1301 (Fed. Cir. 2000) (citing *Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, 1307 (7th Cir.1993)).

As a legal matter, it was not plaintiff's burden to show that *every* step in its ZMP process is private, and not in the public domain. In order to establish that plaintiff possessed "secret" information, it was enough for plaintiff to prove that certain information used in plaintiff's ZMP process, or the sequential steps of the process as a whole, are valuable and are not known outside plaintiff's business. *Mangren Research and Dev. Corp. v. Nat'l. Chem. Co., Inc.*, 87 F.3d 937, 942 (7th Cir. 1996). *See also* Instruction No. 17.[3] In fact, in ruling on the motion for a permanent injunction, the Court has already found that "the testimony does not indicate that Element Nos. 3, 6, 8, and 10 were in the public domain – at least, not in the specific manner in which Morton used them" (Order of April 6, 2001 (citing PX 6, 29-30)). To the contrary, information in the public domain suggested that at least one aspect of the process as developed by Morton would not work. Thus, the defendants' argument that "much" of plaintiff's ZMP process is in the public domain (Def.'s Mem. at 4) is a non-starter, because "much" is not all.

As a factual matter, although the general verdict reached by the jury did not specify which element or elements in the plaintiff's ZMP process it found to be a trade secret, the verdict represents the jury's unanimous judgment that at least one element in this process was entitled to protection. The instructions told the jury it could find for plaintiff on the trade secret claim only if the jury found that plaintiff possessed a trade secret, and gave the jury ample guidance on how to make that determination (*see* Jury Instructions Nos. 15-20). The Court finds that under these instructions (which are unchallenged here), there was sufficient evidence to allow a reasonable jury to find that

---

[3]Defendants do not challenge the sufficiency of plaintiff's evidence concerning the steps they employed to maintain the secrecy of the information.

Chemetall's ZMP process contained trade secret information – and that the defendants misappropriated it.

The plaintiff used PX 135 to compare 15 specific elements of the ZMP manufacturing processes disclosed in the Eagle-Picher report to the processes utilized by plaintiff and by ZR Energy. That exhibit revealed that the ZR Energy process did not track the process disclosed in the publicly-available Eagle-Picher Report (PX6), but instead, tracked the plaintiff's ZMP process in virtually all regards. The evidence showed that the ZR Energy process employed at least one step that the Eagle-Picher Report suggested would not work – a step that the plaintiff's process also employs. A jury might have chalked this up to mere coincidence or some other innocuous reason. But certainly this evidence could have led a jury to reasonably conclude that elements of the plaintiff's process were not in the public domain, but were secret – and that the defendants copied them.

In addition, through the testimony of Mr. Edmonston, the plaintiff pointed out that there is a difference between the chemical formula or reaction for making ZMP, which is commonly known in the public domain, and plaintiff's tested, proprietary process that uses this formula to produce a product for commercial application (Pl.'s Mem. at 11-12 (citing Trial Tr. at 243, 245 and 246)). Mr. Edmonston testified that one "could probably find in the public domain a flow sheet, a single page, that described the chemical reaction that was used to make ZMP, but [one] could not find – at least it was our belief [one] could not find – the detailed recipe that Morton used to make that product." *Id.* (Pl.'s Mem. at 12 (citing Trial Tr. at 243)). Dr. Bick provided similar testimony. In particular, Dr. Bick testified that each of the 15 elements identified in PX 135 was critical to making the ZMP

product safely, as well as ensuring that this product had a certain level of purity and burned in a particular fashion (Trial Tr. at 429-32). This evidence, too, afforded the jury a reasonable basis for concluding that the plaintiff's ZMP process contained trade secret information.

The defendants argue now – as they did at trial – that Mr. Edmonston contradicted plaintiff's position when he testified that he could not point to anything in the Morton process manufacturing instructions ("PMIs") that was proprietary (Def.'s Mem. at 5-6; Trial Tr. at 250). However, elsewhere in his testimony, Mr. Edmonston stated that the Morton process for making ZMP which Chemetall acquired, which is set forth in the PMIs, was not in the public domain (Trial Tr. at 243); *see also* Trial Tr. 245-46) ("I don't think people skilled in the art knew the Morton process as practiced by Morton").

What this highlights is that there was evidence cutting both ways on the issue of whether plaintiff's ZMP process was "secret." It is, or course, common in a jury trial to have conflicts in the evidence. It is the job of the jury to resolve those conflicts. Here, it was up to the jury to decide what weight to give to Mr. Edmonston's testimony, in light of all the evidence. The jury reasonably could conclude that Mr. Edmonston's answer to the lone question cited by defendants did not override all the other evidence indicating that plaintiff's ZMP process contained trade secret information.[4]

---

[4]The same is true for defendants' evidence that plaintiff could have developed every step of their process using information in the public domain (*e.g.*, the Eagle-Picher Report), or by merely regenerating the Eagle-Picher process in reverse (Defs.' Mem. at 6). The jury reasonably could have concluded that the Morton process was sufficiently different from the process disclosed in the Eagle-Picher Report that it was not the product of that public information. The Court also rejects defendants' argument that the ZMP process Morton sold to plaintiff cannot be a trade secret because Mr. Edmonston testified that he believed "Morton is now free to utilize the very process that it sold to Chemetall and the very process that Chemetall now asserts is a trade secret" (Defs.' Mem. at 6). Plaintiff correctly points out that Mr. Edmonston's testimony, "fairly read . . . does not evidence that Morton is now free to use the same process it sold to Chemetall, but only that Morton would be free to return to the zirconium metal powder business" at the end of the

13

The Court concludes that there was substantial evidence from which the jury rationally could find that plaintiff's ZMP process contained trade secret information. Thus, even if not waived, defendant's Rule 50(b) challenge to the jury verdict finding trade secret misappropriation must be denied on the merits.

## 2.

The jury's verdict on the trade secret count against both Mr. Fraval and Mr. Berkovitz reflects that the jury found that each of them played a part in the trade secret misappropriation. The question with regard to punitive damages, however, was whether any defendant acted "willfully and maliciously" in misappropriating the trade secret information, and whether punitive damages should be awarded. The question presented by Mr. Berkovitz's Rule 50(b) motion is whether there was sufficient evidence for a reasonable jury to reach the conclusion that he should be assessed punitive damages.

The jury was instructed that:

> It would also be improper if defendants learned the trade secret from another who used improper means to acquire the information, or who breached a duty of confidentiality in disclosing the information, when the defendant knew or should have known that it [was] acquiring a trade secret belonging to another. Improper means also includes inducing another to use improper means to acquire the information or to breach a duty of confidentiality that person owed to plaintiff.

(Jury Instruction No. 22). The jury was also instructed that if it found a defendant's conduct "willful and malicious," the jury could award punitive damages. The instructions defined "willful and malicious" conduct as including "an intentional misappropriation as well as a misappropriation

---

five year non-compete agreement (Pl.'s Mem. at 13). Plaintiff also correctly points out that even if the jury understood Mr. Edmonston to be saying that Morton could use its own process again after five years, the jury's verdict would still stand because it reasonably could have accepted as more credible Dr. Bick's understanding of the non-compete agreement, which was that Morton could compete after five years but could not use the same process it had sold to plaintiff (Pl.'s Mem. at 13-14). Moreover, the Morton/Chemetall contract is in the record (PX39), and the Court agrees that it "corroborates Dr. Bick's testimony and further supports the verdict" (Pl.'s Mem. at 14).

resulting from the conscious disregard of the rights of another" (Jury Instruction No. 30). While the question is a close one, the Court finds that a jury, following these instructions, reasonably could assess punitive damages against Mr. Berkovitz.

Mr. Berkovitz testified that he asked Mr. Fraval three times whether the information concerning the ZMP process was confidential, and received assurances each time that it was not.[5] However, there also was evidence that would support a reasonable inference that despite those assurances, Mr. Berkovitz "should have known" that he was acquiring trade secret information belonging to another, which would support an award of punitive damages under a "conscious disregard" theory. For example, Mr. Berkovitz admitted that ZR Energy's process for manufacturing ZMP was deemed confidential and not for public distribution and that the document outlining this process (PX 83) was stamped "ZR Energy Company private" (Trial Tr. 462-63). Mr. Berkovitz also described the ZR Energy process for making ZMP to be a "valuable business asset" (*Id.* at 499-500). Based on this testimony, the jury could reasonably infer that Mr. Berkovitz knew or should have known – in spite of Mr. Fraval's assertions to the contrary – that the ZMP process used by Morton likewise was a confidential process and that Mr. Fraval was not authorized to use or disclose it.

Moreover, the Business Plan prepared by Mr. Berkovitz (PX 53) states that ZR Energy was hiring the person who had 20 years of experience at Morton, which had used a process to produce ZMP "perfectly." The jury reasonably could have inferred that this plain reference to Mr. Fraval showed that Mr. Berkovitz relied on the experience and knowledge Mr. Fraval gained at Morton to

---

[5]We reject defendants' argument that in reciting this testimony in closing argument, Chemetall made a judicial admission. Judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1404 (7th Cir. 1997) (*quoting Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995). We do not consider Chemetall's arguments about the significance of testimony to rise to the level of judicial admissions.

enable ZR Energy to manufacture the ZMP product "perfectly" – as Morton did. Mr. Berkovitz argues that the Business Plan shows that ZR got the process from a consultant (the author of the Eagle-Picher Report) and not from Mr. Fraval. But even accepting that reading, the Business Plan reveals that Mr. Fraval would supply the know-how on how to apply the process to manufacture ZMP, utilizing his experience at Morton. The Business Plan, as well as the testimony outlined above, provides sufficient evidence for a reasonable jury to find that Mr. Berkovitz consciously disregarded the trade secret rights of another.

The jury also reasonably could have found that Mr. Berkovitz "induced" Mr. Fraval to join ZR Energy for the purpose of using this confidential information and knowledge in creating the ZR Energy ZMP process, and that Mr. Berkovitz turned a blind eye to what he knew or should have known when he hired Mr. Fraval to manage the manufacturing of ZR Energy's process, namely, that Mr. Fraval would use his confidential experience and knowledge with the Morton process. To uphold the jury's verdict on punitive damages, it is not necessary to find that Mr. Berkovitz expressly knew that Mr. Fraval was breaching an independent duty of confidentially in passing on the Morton ZMP process information to ZR Energy, because there is enough evidence for the jury to have reasonably concluded that he should have known such information would be confidential.[6]

---

[6]Mr. Berkovitz argues that paragraph 4 of the May 7, 1997 Business Plan letter cuts against the punitive damages award because it provides evidence of a motivation to compete, not evidence of willful malice or conscious disregard of another's trade secret rights (Defs.' Reply Mem. at 17). The Seventh Circuit has drawn a distinction between the motivation to compete and malice. *See, e.g., Roton Barrier, Inc. v. The Stanley Works,* 79 F.3d 1112, 1120 (Fed. Cir. 1996). But the Court finds this distinction unhelpful here. While there is no doubt that Mr. Berkovitz sought to compete with plaintiff, the question presented is whether the jury reasonably could have concluded that he chose to do so by improperly obtaining and using information that he knew or should have known was trade secret, in conscious disregard of plaintiff's rights. On this point, the Business Plan does not provide Mr. Berkovitz with a silver bullet against punitive damages.

Finally, we address defendants' argument decrying the alleged "absurdity" of the jury assessing punitive damages against Mr. Berkovitz when it declined to do so against Mr. Fraval (Defs.' Reply Mem. at 16). Defendants reason that (a) because the jury did not assess punitive damages against Mr. Fraval, the jury must have found that the evidence failed to support such an award; and (b) if the evidence was insufficient to support an award of punitive damages against Mr. Fraval, it also was insufficient to support a punitive damages award against Mr. Berkovitz. This argument fails for two reasons.

*First*, the foregoing discussion explains why the Court concludes that the evidence permitted the jury to award punitive damages against Mr. Berkovitz. While it may seem unusual for the jury to have assessed punitive damages against Mr. Berkovitz, who received the trade secret information, and not against Mr. Fraval, who took the information from Morton, the evidence permitted (although it certainly did not require) the jury to make that distinction. The jury had the opportunity to see both Mr. Fraval and Mr. Berkovitz, and to assess their credibility as they testified. The jury was entitled to credit Mr. Fraval's assertion that he believed (albeit mistakenly) that the information he possessed about the ZMP manufacturing process was not confidential or a trade secret. The jury reasonably may have concluded that Mr. Fraval was more experienced and talented in technical rather than in business matters, and that as a result he may have genuinely held the belief that the information was not trade secret or confidential. A jury reaching these conclusions reasonably could find that while Mr. Fraval's mistaken beliefs did not absolve him from liability for trade secret violations, it did make the imposition of punitive damages unwarranted.

By contrast, the jury reasonably could have concluded that Mr. Berkovitz, who was experienced in business affairs, should have known that the information that Mr. Fraval wanted to

bring to the new business they would create was trade secret or confidential, despite Mr. Fraval's protestations that he did not have a confidentiality agreement: after all, ZR Energy treated its own PMI's as confidential information that would not be disclosed to the public. The jury thus could have found that Mr. Berkovitz enabled the trade secret misappropriation by inducing Mr. Fraval to join him for the very purpose of using Mr. Fraval's experience to replicate the ZMP production process that the ZR Energy Business Plan described as allowing the production of "this exact product perfectly."

*Second*, contrary to defendants' assertion, the decision not to assess punitive damages against Mr. Fraval does not necessarily mean that the jury deemed the evidence insufficient to support such an award. The instructions informed the jury that if it found willful and malicious conduct, the jury "may" award punitive damages. The instructions did not automatically require the jury to award punitive damages on a finding of willful and malicious conduct, but rather allowed the jury to do so in its discretion. "[I]t is the jury's function to make the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system.'" *McCluskey v. Kemp*, 481 U.S. 279, 291 (1987) (quoting H. KALVEN & H. ZEISEL, THE AMERICAN JURY, 498 (1996)). Thus, the jury here may have found the evidence insufficient to establish willful and malicious conduct by Mr. Fraval, as defendants contend. Or, the jury may have found that even though Mr. Fraval's conduct met that standard, the jury would exercise its discretion to assess punitive damages only against the person who induced and enabled Mr. Fraval to use the trade secret information – Mr. Berkovitz.

By these comments, we do not suggest that we are able to divine the specific path of reasoning employed by the jury in deciding the punitive damages questions; nor do we seek to do

so. The Court offers this analysis only to show that the evidence at trial offered a reasonable basis for the jury to award punitive damages against Mr. Berkovitz, and to do so at the same time it declined to award punitive damages against Mr. Fraval. On the Rule 50(b) motion, the question presented to the Court is not what award the Court would have made in the first instance, had it been the fact finder, but whether the evidence would permit a reasonable jury to make the award that it did. The punitive damages award in this case against Mr. Berkovitz meets that standard.

### 3.

At trial, the Court instructed the jury on the law applicable to the plaintiff's breach of contract claim:

> For plaintiff to prove that it is entitled to enforce a confidentiality obligation between Mr. Fraval and Morton, concerning Morton's zirconium powder information, plaintiff must prove that there was an intent for plaintiff to become the assignee or successor to that confidentiality obligation.

(Jury Instruction No. 32). The Court finds that the relevant documents provided sufficient evidence to permit reasonable jurors to find that Chemetall has the assignee or successor to Mr. Fraval's confidentiality obligation: On November 20, 1989, Mr. Fraval signed an Employee Trade Secret and Patent Agreement with Morton ("the Fraval Agreement"). That document provides, in relevant part:

> EMPLOYEE acknowledges that he . . . occupies a position of trust and confidence with the COMPANY and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the COMPANY; and agrees that during and after said employment, he . . .will treat as confidential and will not, without express authorization from the COMPANY, disclose or use in whole or in part any Confidential Information that he . . . may acquire while in said employment regarding or relating to the . . . products, operations, processes . . . of the COMPANY, or know-how relating to such. EMPLOYEE'S obligation not to disclose or use any such Confidential Information of the COMPANY after termination of employment with the COMPANY will continue so long as (i) such Confidential Information is not, or has not by legitimate means become, generally known and in the public domain, and (ii) is to be maintained as confidential by the COMPANY.

***

> The above conditions shall apply to all work performed by EMPLOYEE for COMPANY including any of its past, present or future affiliates or subsidiaries, and shall be binding upon EMPLOYEE'S assigns, executors, administrators and other legal representatives. *This agreement shall inure to the benefit of the successors and assigns of COMPANY.*

(PX15 (emphasis added)). The Asset Purchase Agreement between plaintiff and Morton further states in Paragraph 18b:

> All of Seller's employees who have been active in the Business, at any time before the Closing Date, shall be bound to a secrecy undertaking in accordance with paragraph 18a.

(PX39). Taken together, these documents indicate that Mr. Fraval agreed to maintain the secrecy of confidential information about Morton's process, that he agreed that the Fraval Agreement would run to the benefit of Morton's successors, and that Morton and Chemetall agreed that Morton employees such as Mr. Fraval would be bound to secrecy.

The trial testimony provides further direct evidence that plaintiff was intended to be the assignee of and/or successor to Morton's rights to enforce Mr. Fraval's confidentiality agreement. For example, Mr. Edmonston, a representative of Morton during the negotiations with Chemetall, testified that "if a person left the company but was in possession of a trade secret, the requirement is that the person couldn't reveal it. He wouldn't be able to publish it in the Wall Street Journal. That's to protect our trade secrets from employees who leave" (Trial Tr. at 186). Mr. Edmonston further testified that it was his understanding and intent that an employee who had signed the confidentiality agreement would be bound by "paragraph 18b of the Chemetall-Morton agreement" – that is, that Chemetall would be considered an assignee of Morton and therefore a successor to the confidentiality provisions previously binding Morton's employees (*Id.* at 187).

Dr. Bick, who negotiated the deal on behalf of Chemetall, testified to the same understanding of the Morton-Chemetall agreement. Dr. Bick testified that it was his intent that an employee who

left Morton would not have the right to use the ZMP process technology developed by Morton and sold to Chemetall after leaving Morton, and that this employee could not teach the technology to anyone outside the Chemetall company "who might be interested in using it" (Trial Tr. at 306). Dr. Bick also testified that it was Chemetall's intent to be able to enforce the secrecy obligations of the Morton employees directly, without having to rely on Morton, which was leaving the ZMP business and thus might "not have followed up on things" (*Id*. at 306-07).

This evidence was enough to allow the jury to reasonably find that the intent of Morton and Chemetall was that Chemetall would be able to enforce the secrecy obligation in the Fraval Agreement. Mr. Fraval, however, argues that Chemetall cannot enforce that agreement, for three reasons: (a) that there was an explicit exclusion from assignment to plaintiff of all employment contracts, and the Fraval Agreement falls into this exclusion (Defs.' Mem. at 13-14); (b) that Morton failed to secure an independent secrecy undertaking with Mr. Fraval pursuant to the Asset Purchase Agreement with Chemetall (Defs.' Mem. at 15; Defs.' Reply Mem. at 21-22); and (c) that there is no evidence that plaintiff had an intent that it would become an assignee or successor to the confidentiality provisions of the Fraval agreement (Defs.' Mem. at 14).

The Court rejects the first argument. The confidentiality provision Mr. Fraval signed is not limited to his general employment agreement with Morton but extends, by its own terms, to Mr. Fraval's conduct after the termination of his employment with Morton. The jury reasonably could conclude that Chemetall did not have to take Mr. Fraval on as an employee in order to obtain the benefits of the confidentiality pledge Mr. Fraval made as part of the Fraval Agreement.

Mr. Fraval's second argument is equally unavailing, because there is no authority for the proposition that Morton or Chemetall had to secure an independent secrecy obligation from Mr.

Fraval to make binding Mr. Fraval's initial promise to maintain confidentiality in the Fraval Agreement. The jury could reasonably find that Mr. Fraval undertook a secrecy obligation in his agreement with Morton, and that Morton transferred this right to Chemetall. Accordingly, the Court rejects defendants' argument that Mr. Fraval needed to enter into a separate, independent confidentiality agreement with Chemetall.

Finally, in regard to the third argument, the jury reasonably could find that Chemetall was a successor or assign of the Morton ZMP business. In the Fraval Agreement, Mr. Fraval agreed generally that his confidentiality undertaking would "inure to the benefit of the successors and assigns" of Morton. Dr. Bick further testified that paragraph 18(a) and (b) of the Asset Purchase Agreement was intended to provide Chemetall with a right of action against any former Morton employee who attempted to use or teach the technology sold to Chemetall by Morton (Trial Tr. at 306-07). Mr. Edmonston confirmed that this was Morton's understanding of the Asset Purchase Agreement as well (Trial Tr. 186-87). This evidence allowed the jury reasonably to find that even though the Fraval Agreement (not surprisingly) failed to specify whom the future successors or assigns might be, this fact did not give Mr. Fraval an escape hatch through which he could avoid his contractual undertaking.

Accordingly, even were it not waived, Mr. Fraval's Rule 50(b) motion to overturn the breach of contract verdict fails on the merits.

## II.

In the alternative to their Rule 50(b) motion, defendants move for a new trial. Under Rule 59(a), "[o]nly when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day." *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 424 (7th Cir. 2000). *See also Latino v. Kaizer,* 58 F.3d 310, 314, 315 (7th Cir. 1995) ("grant of a motion for a new trial begs more stringent review than a denial, and a still more rigorous review when the basis of the motion was the weight of the evidence") (citing *Williams v. City of Valdosta,* 689 F.2d 964, 974 (11th Cir. 1982)). If there is any reasonable basis in the record to support the verdict, then it cannot be overturned in favor of a new trial. *Cefalu,* 211 F.3d at 424 ("As long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict" (quoting *Robinson v. Burlington N.R. Co.,* 131 F.3d 648, 656 (7th Cir. 1997)). *Scaggs v. Consolidated Rail Corp.,* 6 F.3d 1290, 1293 (7th Cir. 1993). The Court's ruling that there was sufficient evidence for a reasonable jury to reach its verdicts on the trade secret misappropriation claim against all defendants, the punitive damages award against defendant Berkovitz, and the breach of contract claim against defendant Fraval, leads the Court to conclude that the jury's verdicts were not against the manifest weight of the evidence.

A Rule 59(a) motion also may be used to seek a new trial on grounds other than weight of the evidence: such as, to "correct manifest errors of law or to present newly discovered evidence." *See Boyd v. Village of Carol Stream,* No. 99 C 6514, 2001 WL 641301 (N.D. Ill., June 1, 2001) (quoting *Rosera v. Int'l. Harvester Co.,* 109 F.R.D. 143, 148 (E.D. Wis. 1986)). *See also Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1367 (7th Cir. 1996) (a motion for new trial may be granted where "the verdict is against the weight of the evidence, the damages are

excessive, or if for other reasons the trial was not fair to the moving party") (quoting *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir. 1996). But here, defendants cite no error of law or newly discovered evidence in aid of their motion, and the Court finds that defendants here received a fair trial. Thus, the Court finds that the defendants' motion for judgment notwithstanding the verdict or for a new trial must fail under Rule 59(a).

## III.

In light of the jury verdicts, on March 12, 2001, the Court entered judgment in favor of the plaintiff and against the defendants on Counts I (trade secret misappropriation) and II (breach of contract) in the following amounts:

| | | |
|---|---|---|
| Joseph T. Fraval: | Count I | ($1,625.00) (compensatory damages) |
| | Count II | ($1,625.00) (compensatory damages) |
| Arnold Berkovitz : | Count I | ($3,250.00) (compensatory damages) |
| | | ($3,250.00) (punitive damages) |
| ZR Energy, Inc.: | Count I | ($131,750.00) (compensatory damages) |

(3/12/01 Judgment, doc. # 102). The plaintiff now seeks to amend the judgment to include: (a) prejudgment interest on all compensatory damages awarded against all defendants; and (b) post-judgment interest on the original jury award against ZR Energy and Mr. Berkovitz (but not against Mr. Fraval, who has paid the judgment including post-judgment interest).

## A.

In diversity cases (such as this one), "federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Medcom Holding Company*, 106 F.3d at 1405. Since the substantive law governing the trade secret and contract claims is supplied by Illinois, so, too, are the principles governing the question of prejudgment interest.

In Illinois, there are three sources that may provide authority for an award of prejudgment interest: (1) statute, *see, e.g., Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1007 (7th Cir. 1989); (2) agreement of the parties, *see, e.g., Medcom*, 106 F.3d at 1405; and (3) equity, *People ex rel. Hartigan v. Illinois Commerce Commission*, 592 N.E.2d 1066, 1093 (Ill. S.Ct. 1992); *In Re Estate of Wernick*, 535 N.E.2d 876, 887-88 (Ill. S.Ct. 1989).[7] The parties agree that there is no contractual basis for prejudgment interest. But after that point of agreement, the parties' arguments are akin to ships passing in the night. Defendants assert that there is no statutory authorization in the Illinois Trade Secret Act ("ITSA") for prejudgment interest and no basis for prejudgment interest on the contract award – without ever citing *Wernick* or the cases recognizing the equitable authority under Illinois law to award prejudgment interest. For its part, plaintiff rests its claim to prejudgment interest solely on equitable considerations – without ever addressing the question of whether there is statutory authorization for prejudgment interest under the ITSA, or a basis in equity to award prejudgment interest on a claim for breach of contract. We address the question of authority under the ITSA first, and then move to a discussion of equitable authority.

## 1.

The ITSA provides that a plaintiff may obtain damages for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4 (1998). The parties have not cited, and the Court has not found, any Illinois state court decisions that address whether this language in the ITSA

---

[7]The defendants argue that prejudgment interest is not available under the Illinois Interest Act ("IIA"), 815 ILCS 205/2, because the principle sum was not liquidated or subject to an easy determination before judgment. This point is without consequence, since plaintiff does not premise its request for prejudgment interest on the IIA.

authorizes a court to award prejudgment interest. In the absence of any guidance from the Illinois Supreme Court, or any binding authority from the Seventh Circuit, this Court must determine how the Illinois Supreme Court would rule if presented with this issue. *Allen v. Transamerica Inc. Co.*, 128 F.3d 462, 466 (7th Cir. 1997). Illinois law recognizes that with any question of statutory construction, the best place to start is with the language of the statute itself, *In Re Application of the Cook County Collector of DuPage County for Judgment for Delinquent Taxes for the Year* 1992, 692 N.E.2d 264, 267 (Ill. S.Ct. 1998), and so that is where we begin.

The ITSA does not expressly authorize an award of prejudgment interest. The ITSA identifies two different types of potential damage that a plaintiff may recover: actual loss suffered to the plaintiff by the misappropriation, and unjust enrichment obtained by the defendant to the extent that it is not merely duplicative of plaintiff's loss. One might reasonably construe actual loss and unjust enrichment to encompass the concept of prejudgment interest. The plaintiff's actual loss includes not only revenues it otherwise would have obtained, but interest on the money that it would have been able to earn had the plaintiff received the revenue when it should have; likewise, unjust enrichment to a defendant can fairly be read to include not only the revenue the defendant improperly received, but interest that the defendant earned or could have earned on that money.

However, that same argument can be made for virtually any damages scheme. Anytime a plaintiff is deprived of money it otherwise should have received (or a defendant obtains money that the defendant should not otherwise have had), plaintiff's loss or defendant's unjust enrichment also can be read to include the time value of the money. By this reasoning, any statute that provides generally for an award of "actual loss" or "unjust enrichment" damages could be construed as

including an award of prejudgment interest. To accept this construction would lead to the wide-spread implication of statutory authority for awarding prejudgment interest, in the absence of the Illinois legislature expressly providing that as part of the remedial scheme.

However, when interpreting statutes other than the ITSA, Illinois appellate courts have not shown an inclination to imply an authorization to award prejudgment interest from general statutory language. For example, in *Johnson v. Human Rights Commission*, 527 N.E.2d 883, 885 (Ill. App. 1st Dist. 1988), the Court held that a provision of the Illinois Human Rights Act authorizing any action "to make the individual complainant whole" did not authorize the award of prejudgment interest. Likewise, in *Robles v. Chicago Transit Authority*, 601 N.E.2d 869, 882 (Ill. App. 1st Dist. 1992), the Court held that a provision of the Illinois Wrongful Death Act providing for "fair and just compensation" did not constitute a statutory grant of authority to award prejudgment interest.

Relying on this case law, the Federal Circuit in *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1305 (Fed. Cir. 2000), held that the ITSA does not authorize an award of prejudgment interest. In reaching that determination, the Court reversed a decision of the district court written by Judge Williams (then a district judge, and now sitting as Circuit Judge on the Seventh Circuit Court of Appeals). 1999 WL 102798. Neither the district court nor the federal circuit decision in *C&F Packing Co.* is binding here. But, in light of the statutory language of the ITSA and the Illinois appellate decisions declining to construe similarly broad provisions to include authorization for statutory prejudgment interest, the Court concludes that if presented with the question, the Illinois Supreme Court would hold that the ITSA does not provide for a statutory authorization to award prejudgment interest.

## 2.

The absence of express statutory authority, however, does not end the inquiry, because the Court's equitable powers to award prejudgment interest to make an injured party whole are broad. *See In re Estate of Wernick,* 535 N.E.2d at 887; *see also City of Milwaukee v. Cement Div., Nat'l Gypsum,* 515 U.S. 189, 195 (1995). "Whether equitable circumstances support an award of interest is a matter lying within the sound discretion of the trial judge." *Wernick,* 535 N.E.2d at 888.[8]

In *Wernick,* the Illinois Supreme Court applied this general rule to a case involving breach of a fiduciary duty and held that equity required an award of prejudgment interest "to make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." 535 N.E.2d at 888. The Court stressed that prejudgment interest is awarded based on "a concept of fairness and equity, and not as a sanction against the defendant," and that "[f]undamental principles of damages and compensation dictate that when money has been wrongfully withheld the victim receive interest for the wrongdoer's retention of his money." *Wernick,* 535 N.E.2d at 888.

---

[8]To the extent defendants suggest that prejudgment interest can only be awarded where there is express authorization by statute or agreement, the cases they cite for this proposition prove their theory to be erroneous. *See, e.g., Continental Casualty Co. v. Commonwealth Edison Co.,* 676 N.E.2d 328, 331-32 (Ill. App. 1st Dist. 1988) (acknowledged validity of equitable prejudgment doctrine but refused to apply it in that case because there was no element of bad conduct and case involved breach of contract, an action at law not equity); *In re Marriage of Pitulla,* 559 N.E.2d 819, 831 (Ill. App. 1st Dist. 1990) (violation of fiduciary or confidential relationship can warrant award of prejudgment interest in equitable circumstances); *Alguire v. Walker,* 506 N.E.2d 1334, 1341 (Ill. App. 1st Dist. 1987) (court did not say equity would never authorize prejudgment interest award; it only said there was no unique basis for prejudgment award in that case). *See also Gray v. Mundelein College,* 695 N.E.2d 1379, 1387(Ill. App. 1st Dist. 1998) (considered only application of Illinois Interest Act, not equity); *Bank of Chicago v. Park National Bank,* 640 N.E.2d, 1288, 1295 (Ill. App.1st Dist. 1994) (same); *North Shore Marine, Inc. v. Engel,*401 N.E.2d 269, 273 (Ill. App. 2d Dist. 1980) (same). Moreover, the Seventh Circuit has recognized that Illinois courts have upheld the equitable power to award prejudgment interest even in the absence of statutory authority. *See, e.g., Lovejoy,* 873 F.2d at 1007.

An equitable award of prejudgment interest is warranted in this case based on the same principle. In this case, as in *Wernick*, the jury found that the plaintiff's property had been taken and used based on an illegal act, and that the plaintiff was deprived of the use of funds associated with this property for the time that the defendant had possession of it. In *Wernick*, the property was land, the illegal act was breach of a fiduciary duty, and the funds at issue were the proceeds from sale of the land. Here, the property was the ZMP process sold by Morton to Chemetall, the illegal act was trade secret misappropriation, and the funds at issue were the proceeds of ZMP sales that plaintiff could have made but for the misappropriation of the plaintiff's trade secret.

The holding in *Wernick* is not limited to breach of fiduciary duty cases.[9] But, even if it was, this case involves breach of a confidential duty of a fiduciary nature. The jury clearly found that Mr. Fraval breached a duty of confidentiality in sharing his knowledge of Morton's ZMP process with defendants. Moreover, even if ZR Energy and Mr. Berkovitz could not be tagged with a fiduciary or confidentiality breach, the trade secret misappropriation here is tantamount to fraud, which plainly falls within the equitable authority to recompense through prejudgment interest. *See Lovejoy*, 873 F.2d at 1007. Fraud is a "generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth and includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." BLACK'S LAW DICTIONARY at 594 (5th ed. 1979).

---

[9] *C&F Packing* arguably could be read to state that the court's equitable powers are confined to cases presenting fiduciary or confidential relationships. 224 F.3d at 1305. But, the Seventh Circuit has recognized at a minimum that this equitable power also extends to cases of fraud. *Lovejoy*, 873 F.2d at 1007. And, the language of Illinois Supreme Court cases is even more sweeping. For example, in *Wernick*, the Illinois Supreme Court noted with approval the "current trend" in other states "to allow an award of interest on funds owing so that justice might be accomplished in each particular case," and noting that in Illinois, "prejudgment interest may be recovered when warranted by equitable considerations[.]" *Wernick*, 353 N.E.2d at 887-88.

As determined by the jury verdict, the misappropriation by ZR Energy and Mr. Berkovitz certainly constitutes an "unfair way by which another is cheated." And, even if trade secret misappropriation were deemed not to rise to the level of a fraudulent act, "within the limits of an adversarial system" the Court has a "responsibility to do justice insofar as [it] can . . . ." *Lovejoy,* 873 F.2d at 1007. Here, the make-whole purpose of prejudgement interest and the evidence in this case, which clearly demonstrates that ZR Energy made sales that would have fallen to plaintiff but for defendants' use of plaintiff's trade secret prior to judgment, militate in favor of a prejudgment interest award. *See, e.g., Roton Barrier,* 79 F.3d at 1123 (affirming use of equity to award prejudgment interest in trade secret misappropriation case). Accordingly, we conclude there is equitable authority under Illinois law to award prejudgment interest on the trade secret misappropriation award, and that this case presents an appropriate circumstance in which to exercise that authority.[10]

But the Court does not find it appropriate to award prejudgment interest on the full amount of $131,750.00 awarded against ZR Energy. Plaintiff asked the jury to award $435,000.00 in compensatory damages against ZR Energy on the trade secret claim: (a) $77,500.00 in plaintiff's lost profits, and (b) $375,000.00 in alleged diminished value of the trade secret (Trial Tr. 1094-96). The jury award of $131,750.00 shows that the jury did not accept this calculation in full. In reviewing the evidence, the Court believes the evidence supporting the lost profit calculation was stronger than that supporting the lost value calculation. Plaintiff offered evidence of how much ZMP

---

[10]The defendants argue that if the Court awards prejudgment interest it should exclude from that assessment the compensatory damages awarded levied against defendant Berkovitz, because he already has had a punitive damage award levied against him (Defs.' Resp. at 8). This argument is meritless because prejudgment interest is a compensatory remedy, not a penalty. Thus, to award prejudgment interest on the compensatory damage award is to award the full amount of compensatory damages the Court finds the plaintiff entitled to under principles of fairness and equity; it is not to impose an additional penalty. *See, e.g., First Nat. 'l Bank,* 172 F.3d at 480.

was sold by ZR Energy; evidence that plaintiff would have had those sales if ZR Energy did not make them; and evidence concerning plaintiff's prices and profit margin. By contrast, the lost value calculation was based on an after-the-fact attempt to allocate $550,000.00 assigned in the Asset Purchase Agreement to "intangible" value of assets as between the ZMP process and other assets Morton sold to plaintiff. Moreover, even if the jury accepted plaintiff's allocation of a $375,000.00 value to the ZMP process, the jury reasonably could have determined that if diminished by defendants' actions, the value of the trade secret nonetheless was not reduced to zero, which was the premise of plaintiff's calculation.

Thus, for purposes of awarding interest against ZR Energy, the Court finds it equitable to act on the basis of the jury's $131,750.00 award being divided between lost profits ($77,500.00) and lost value of the trademark ($54,250.00). The Court further awards prejudgment interest only on the lost profits portion of the award, since that reflects lost money on which plaintiff could earn interest. Since interest could not be earned (or lost) on the intangible value of the trademark, the Court does not believe equity warrants an award of prejudgment interest on that portion. The Court will award prejudgment interest on the ITSA awards against Mr. Fraval ($1,625.00) and Mr. Berkovitz ($3,250.00). In the Court's view, these awards seek to deprive those defendants of unjust enrichment for their actions, and prejudgment interest will serve that make-whole purpose.

However, the Court will not assess prejudgment interest on the amount awarded against Mr. Fraval for breach of contract. Illinois law, of course, treats a claim for breach of contract as one that is legal rather than equitable in nature. In the absence of a statutory or contractual authorization for prejudgment interest on the breach of contract award, the Court has found no authority – and

plaintiff has cited none -- holding that the Court's equitable authority may be used to provide the remedy of prejudgment interest on a breach of contract claim at law. Moreover, the Court notes that the parties to the Fraval Agreement could have bargained for prejudgment interest as a contractual remedy. In light of their unexplained failure to do so, the Court finds no equitable reason to engraft onto the contract a remedy that the parties chose to omit.

Accordingly, the Court proceeds to calculate prejudgment interest on the trade secret compensatory damages awards against ZR Energy ($77,500.00), Mr. Fraval ($1,625.00) and Mr. Berkovitz ($3,250.00). In order to determine what prejudgment interest is to be awarded on each of those verdicts, the Court must consider the interest rate to be applied, the date on which the interest is to begin accruing, and whether the interest is to be compounded and, if so, on what basis. The Court now turns to those questions.

### 3.

The Court finds that an award of prejudgment interest sufficient to make the plaintiff whole should be calculated according to the prevailing market rate (*i.e.,* the Federal prime rate). *See, e.g., Medcom Holding Co. v. Baxter Travenol Labs., Inc.,* 200 F.3d 518, 519 (7th Cir. 1999); *First Nat. Bank of Chicago v. Standard Bank & Trust,*172 F.3d 472, 480 (7th Cir. 1999). *See also In re Estate of Wernick,* 535 N.E.2d 887-889 (suggesting that use of market rather than statutory interest rate is necessary to make party whole); *People v. Illinois Commerce Comm.,* 592 N.E.2d 1066, 1087-88 (Ill. 1992) (rejecting statutory rate of five percent and choosing market rate of nine percent for prejudgment interest awarded in equity). Based on the most current information (updated July 2, 2001), obtained from the Federal Reserve Bank of New York, the applicable prime rates for the relevant period have been as follows:

32

| **1998** | | | **2000** | |
|---|---|---|---|---|
| October 16 | 8.00 | | February 3 | 8.75 |
| November 18 | 7.75 | | March 22 | 9.00 |
| | | | May 17 | 9.50 |
| **1999** | | | **2001** | |
| July 1 | 8.00 | | January 4 | 9.00 |
| August 25 | 8.25 | | February 1 | 8.50 |
| November 17 | 8.50 | | March 21 | 8.00 |

See *ftp://ftp.ny.frb.org/prime/Prime.txt/.*

The plaintiff suggests that the lowest rate in the relevant period – 7.75 percent – should apply to its claim for prejudgment interest. Defendants do not offer an alternative rate. Plaintiff's position is reasonable, considering that other courts have applied an average of the prevailing prime rates, *see Harrison,* 1995 WL 127792, * 16, which here would yield a higher percentage than 7.75 percent. Thus, the Court will use the rate of 7.75 percent.

The plaintiff asks that the prejudgment interest be compounded on a monthly basis, because monthly compounding will most closely approximate the actual time value loss of money it incurred as a result of defendants' misappropriation of its trade secret. Courts have approved of awards compounding the prejudgment interest. *E.g., Harrison,* 1995 WL 127791, *16 (applying the average prime rate compounded monthly); *see also Gorenstein Enterprises, Inc. v. Quality Care-USA Inc.,* 874 F.2d 431, 437 (7th Cir. 1989) (compounding of interest left to court's discretion to compensate plaintiff for lost use of money; district court's refusal to compound prejudgment interest can be reversed for an abuse of discretion). Again, the defendants do not offer an alternative compounding period. The Court accepts the monthly compounding rate as reasonable, given that businesses often bill customers on a 30-day or monthly cycle.

Finally, there is the question of the date on which to begin the interest calculation. In the abstract, the answer to that question is simple: prejudgment interest should start accruing from the

date that the unjust enrichment began, or that plaintiff began losing money. *Perlman v. Zell*, 185 F.3d 850, 857-60 (7th Cir. 1999) (under Illinois law, prejudgment interest was applicable from the date payment became due, and not from the date the complaint was filed). But at least as to ZR Energy, determining the starting date is a challenging task because not all of the lost profit accrued on a fixed date. Plaintiff suggests that date should be August 26, 1997 in the case of ZR Energy, as that allegedly is the date that ZR induced Fraval to sign the employment contract; and September 5, 1997 for Mr. Berkovitz and Mr. Fraval, since that is the date that the evidence shows $6,500.00 was paid by Mr. Berkovitz to Mr. Fraval as Mr. Fraval was preparing to come to ZR Energy (and to bring with him plaintiff's trade secret information). Defendants have offered no evidence or argument concerning the propriety of these dates, and have not suggested alternative dates. Nonetheless, while it is not the Court's role to make arguments the parties chose not to offer, "within the limits of an adversarial system our judges have a responsibility to do justice in so far as they can." *Lovejoy*, 873 F.2d at 1007 (finding no error in the trial court awarding pretrial interest even though a party did not ask for it). Thus, the Court independently considers the propriety of the dates suggested by plaintiff, as well as alternative dates.

The Court finds that plaintiff's proposed date for ZR Energy would result in the calculation of prejudgment interest beginning too early. The evidence shows that ZR Energy made no sales until October 1998 (Trial Tr. at 547). Thus, to peg the start date of calculation of prejudgment interest to a time long before any sales actually were achieved would result in an award of too much prejudgment interest. That is particularly so inasmuch as the sales did not all occur at a fixed point in time, but rather at different intervals over a multi-year period.

In these circumstances, the Court believes that the most appropriate start date for calculating prejudgment interest as against ZR Energy is November 1998, the first month after ZR Energy first began making sales of ZMP. For purposes of this calculation, the Court will assume that the $77,500.00 accrued equally for that time through February 2001, the last full month before trial. Thus, in calculating prejudgment interest on the sum of $77,500.00, the Court will divide that number by the number of months from November 1998 through February 2001, which results in 28 months, and $2,767.86 per month. The Court will then assess prejudgment interest on the amount allocated to each month, compounded on a monthly basis.

As for the ITSA compensatory damages awards against Mr. Berkovitz ($3,250.00) and Mr. Fraval ($1,625.00), the plaintiff argued a theory, in essence, of unjust enrichment (Trial Tr. 1096-97). The Court finds it equitable to use the date of September 5, 1997 to begin the prejudgment interest calculation as to both of those defendants, as that is the date on which the check was issued.

To calculate monthly compounded interest the following standard formula is used:

$$A = P(1+r/12)n - P$$

where A denotes the amount of interest; P equals the principal or owed amount; r equals the annual interest rate; and n equals the number of months.

Because each of the defendants owes plaintiff for some additional days beyond the last monthly increment (12 days in March 2001 in the case of ZR Energy, and 8 days in the case of Messrs. Fraval and Berkovitz), the interest for the remaining days can be adjusted by a fraction reflecting the number of days remaining after the last accrual increment until the day of judgment, divided by 30. The monthly compounded interest formula rests on the 360 days/year, and 30 days

35

per month methodology (12 compounding periods in a year results in 30 days a month). In short, interest for the overhead days can be calculated as follows:

$P(1+rd/12*30) = P(1+rd/360)$

where: P equals present value; d equals the number of days remaining after the last compounding increment until the last day for which interest is due; r equals the annual interest rate.

This methodology, in conjunction with the standard monthly compounding formula, leads to this ultimate, monthly compounded, interest formula:

$$A = P(1+r/12)^n*(1+rd/360) - P$$

This formula is also used to calculate interest on overdue Federal Government payments under the Prompt Payment Act. 5 C.F.R. § 1315.17 (2001). Assuming these formulas as a base line, the Court has calculated the following prejudgment amounts for each defendant on Count I.

In calculating prejudgment interest against ZR Energy on the sum of $77,500.00, we divided that sum by the number of months from November 1998 through February 2001 (28 months), which results in equal monthly accrual of $2,767.86 per month. Prejudgment interest must be assessed on the amount allocated to each month, and compounded on a monthly basis. The standard formula for calculating monthly compounded interest (which is conceived for calculation of interest on a single sum of money), therefore, needs to be adjusted to reflect the manner in which the Chemetall's loss accrued. Accordingly, after the first month prejudgment interest against ZR Energy -- M1 = $2767.86(1+0.0775/12) = $2785.74, after two months -- M2 = (M1+$2767.86)(1+0.0775/12) = $5589.46 , after three months -- M3 = (M2+$2767.86)(1+0.0775/12), and so forth until the 28th month, when it reached M28 = (M27+$2767.86)(1+0.0775/12) = $85,197.80. Finally, the inclusion of the additional days from March 1 to March 12 leads to the final calculation of the entire

36

prejudgment interest: A = $85,197.80(1+0.0775*12/360) − $77,500.00. Application of this methodology brings the total of prejudgment interest due from ZR Energy to $7917.88,[11] and increases the total amount due in damages to Chemetall from ZR to $139,667.88.

For the $3,250.00 compensatory damages award against Mr. Berkovitz, the period for calculating prejudgment interest runs from September 5, 1997 through the date of judgment or March 12, 2001, a period of 42 months and 8 days. Substituting the variables in the interest formula we obtain: $3250(1 + .0775/12)^{42} * (1 + .0775 * 8/360)$, which brings the total of prejudgment interest owed by defendant Berkovitz to $1,016.33, and increases the total amount of damages due to plaintiff from defendant Berkovitz to $4,266.33.

As for Mr. Fraval, the period for calculating prejudgment interest on fee judgment amount of $1,625.00 is the same as for Mr. Berkovitz: 42 months and 8 days. Using the formula described above, calculation yields a prejudgment interest in the amount of $508.16, which Mr. Fraval now owes (having already paid the judgment amount).

## B.

The plaintiff also asks the Court to amend the March 12, 2001 judgment to include post-judgment interest on the compensatory damage awards against the defendants, pursuant to 28 U.S.C. Section 1961. The defendants do not dispute that Section 1961 provides for an award of post-

---

[11] This simplified calculation best illustrates how the prejudgment interest against ZR Energy accrued based on the amount of damages allocated to each month: $(2767.86(1 + .0775/12)^{28} + 2767.86(1 + .0775/12)^{27} + 2767.86(1 + .0775/12)^{26} + 2767.86(1 + .0775/12)^{25} + 2767.86(1 + .0775/12)^{24} + 2767.86(1 + .0775/12)^{23} + 2767.86(1 + .0775/12)^{22} + 2767.86(1 + .0775/12)^{21} + 2767.86(1 + .0775/12)^{20} + 2767.86(1 + .0775/12)^{19} + 2767.86(1 + .0775/12)^{18} + 2767.86(1 + .0775/12)^{17} + 2767.86(1 + .0775/12)^{16} + 2767.86(1 + .0775/12)^{15} + 2767.86(1 + .0775/12)^{14} + 2767.86(1 + .0775/12)^{13} + 2767.86(1 + .0775/12)^{12} + 2767.86(1 + .0775/12)^{11} + 2767.86(1 + .0775/12)^{10} + 2767.86(1 + .0775/12)^{9} + 2767.86(1 + .0775/12)^{8} + 2767.86(1 + .0775/12)^{7} + 2767.86(1 + .0775/12)^{6} + 2767.86(1 + .0775/12)^{5} + 2767.86(1 + .0775/12)^{4} + 2767.86(1 + .0775/12)^{3} + 2767.86(1 + .0775/12)^{2} + 2767.86(1 + .0775/12)^{1})(1 + .0775*12/360) − 77500 = 7917.88.$

judgment interest in all federal cases, "including diversity cases." *Gorenstein Enterprises, Inc.*, 874 F.2d at 436-37.

The method of calculation of interest on money judgments in civil cases recovered in district courts changed as of December 21, 2000, which amended Section 1961(a). Interest is now calculated at a rate equal to the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of the judgment, as published by the Board of Governors of the Federal Reserve System. 28 U.S.C. § 1961(a). Such interest should be computed daily from the date of entry of the judgment (in this case the week preceding March 12, 2001) to the date of payment, and should be compounded annually. 28 U.S.C. § 1961(a)-(b).

The weekly average one-year constant maturity Treasury yield for the calendar week ending March 9, 2001 was 4.47 percent. *See http://wwwfederalreserve.gov/releases/H15/data/wf/tcm1y.txt.* Accordingly, the daily rate of post-judgment interest in this case amounts to 0.0447/365. To calculate daily interest for the entire relevant post-judgment period the following formula may be used: P(r/365*d), where P is the amount of principle; r expresses interest rate; and d equals the numbers of days for which interest is being calculated.

As for defendant ZR, the jury awarded plaintiff $131,750.00 in compensatory damages ZR has not yet paid these damages. Therefore, the *per diem* rate equals $16.1349 ($131,750.00* .0447/365). As of September 14, 2001, 186 days after the judgment, the accrued post-judgment interest is $3,001.08.[12]

---

[12]The amount of $3,001.08 is a final result of using the formula for post-judgment interest. If the *per diem* rate were used, the result would be $3,001.09. The difference can be ascribed to the imperfections of the decimal system and an approximation of the *per diem* rate to the fourth decimal point.

As for Mr. Berkovitz, the jury awarded plaintiff $3,250.00 in compensatory damages. Mr. Berkovitz has not paid these damages. The *per diem* rate equals $.3980 ($3,250.00*.0447/365). As of September 14, 2001, 193 days after the judgment, the accrued post-judgment interest would is $74.03.

As for defendant Fraval, the plaintiff acknowledges that he has tendered payment of the judgment amount, including post-judgment interest. There is no further calculation necessary as to him.

## IV.

Pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920, plaintiff has submitted a bill of costs ("Bill") requesting that costs associated with the litigation be taxed against the defendants in the amount of $29,391.95.[13] Defendants request that the Court deny the motion, or in the alternative, limit plaintiff's recovery of costs. For the following reasons, the Court grants in part and denies in part the plaintiff's Bill, and awards costs totaling $26,102.07.

## A.

Pursuant to Rule 54(d), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs[.]" Consistent with Rule 54's literal language, "the prevailing party is *prima facie* entitled to costs and it is incumbent on the losing party to overcome the presumption." *McGill v. Faulker*, 18 F.3d 456, 459 (7th Cir. 1994) (quoting *Popeil Brothers, Inc. v. Schick Electric, Inc.*, 516 F.2d 772, 775 (7th Cir. 1975)); *M.T. Bonk Co. v. Milton*

---

[13]The plaintiff arrives at $29,391.95 by taking its original request of $29,554.73, adding $1,043.80, the amount it seeks to add *instanter* based on an undiscovered invoice for exemplification costs from TrialGraphix, and deducting $1,206.58, which plaintiff now concedes is a non-taxable deposition expense (Pl.'s Reply at 1-2). For the reasons stated *infra*, the Court grants plaintiff's request to modify its Bill *instanter*. The Court will refer to the modified bill of costs simply as the "Bill."

*Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991) ("Rule 54(d) creates a presumption that the prevailing party will recover costs, and that the ultimate decision to award costs is within the district court's discretion").

The burden of proof is not on the prevailing party to establish that it is entitled to the costs, but on the losing party to establish reasons to deny costs. *Movitz v. First National Bank of Chicago*, 982 F. Supp. 571, 573 (N.D.Ill. 1997); *Moriarty v. Glueckert Funeral Home, Ltd.*, No. 95 C 2848, 1999 WL 162792, at *1 (N.D.Ill. March 11, 1999) (citing *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 455 (7th Cir. 1998) and *M.T. Bonk Co.*, 945 F.2d at 1409; *Rizzo v. Mr. Coffee, Inc.*, No. 94 C 5825, 1996 WL 84235, at *1 (N.D.Ill. Feb. 26, 1996) ("The losing party must affirmatively demonstrate the prevailing party is not entitled to costs"). Moreover, "the presumption [favoring the award of costs] is difficult to overcome, and the district court's discretion is narrowly confined – the court must award costs unless it states good reasons for denying them." *Weeks v. Samsung Heavy Indus. Co. Ltd.*, 126 F.3d 929, 945 (7th Cir. 1997).

Generally, only two reasons justify denying costs: (1) misconduct by the prevailing party worthy of penalty, or (2) the losing party's inability to pay. *Id.* Although defendants urge that plaintiff be denied its costs "in whole or in part" (Defs.' Mem. at 2), the defendants have provided no evidence that either exception to an award of costs should be invoked by this Court: there is no evidence of misconduct by the plaintiff; and defendants have not demonstrated an inability to pay, which requires a showing of indigency. *Reed v. Int'l Union of United Auto., Aerospace, & Agric. Implement Workers of America*, 945 F.2d 198, 204 (7th Cir. 1991); *Bass v. Zeta Consumer Prods.*,

No. 98 C 8235, 1999 WL 1129603, at *1 (N.D.Ill., Dec. 3, 1999). Thus, under prevailing law, the plaintiff is entitled to an award of recoverable costs in this case.

## B.

An award of costs should be entered if a listed expense is authorized by statute and is both reasonable and necessary to the litigation. *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble Co.*, 924 F.2d 633, 642 (7th Cir. 1991). *See also Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000). Under 28 U.S.C. § 1920, a federal court may tax as costs:

(1)     Fees of the clerk and marshal;
(2)     Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3)     Fees and disbursements for printing and witnesses;
(4)     Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5)     Docket fees under section 1923 [of the U.S. Code]; and
(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 [of the U.S. Code].

Applying these standards, the Court turns to an analysis of the specific costs sought by plaintiff.

### 1.     Fees of the Clerk.

Plaintiff requests $150.00 in fees of the clerk and provides a receipt of services in support of this claim (Pl.'s Bill, Ex. 1). Such fees are taxable as costs under Section 1920. *Movitz*, 982 F.Supp. at 574. The plaintiff's documentation supports its claim and the defendants do not object to it (Defs.' Mem. at 3); therefore, the Court will award the plaintiff the fees it paid to the clerk in the amount of $150.00.

## 2.    Fees of the Marshal.

The plaintiff also seeks $50.00 in fees for subpoena service of the Cohen Group.   The defendant does not object to the necessity of this item of cost, but objects to this charge on the grounds that: (1) the $50.00 fee exceeds that charged by the Marshal Service, and (2) the "reasonableness" of this charge cannot be examined because the invoice does not identify "what was served, at what address such service was accomplished, and how long such service took" (Defs.' Mem. at 9).

Courts in this district have held that an award of costs for private process of service is authorized under Section 1920, and that a charge of more than $50.00 can be reasonable. *E.g.*, *Mundadi v. Nikken Inc.*, No. 91 C 7425, 1993 WL 54534, at *5 (N.D. Ill. March 1, 1993).   However, the Seventh Circuit has held private service expenses may be awarded only so long as they do not exceed those which the Marshal Service would have charged, stating that "we think it best to resolve the ambiguity of Section 1920 [which does not speak to private process servers and only addresses Marshal services] in favor of permitting the prevailing party to recover service costs that do not exceed the marshal's fees, no matter who actually effected service." *Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996); *Barnett v. City of Chicago*, No. 92 C 1683, 1999 WL 138813, at * 3 (N.D. Ill. March 5, 1999) ("[s]ubpoena costs are taxable to the extent the Marshal Service is authorized to charge for such costs under 28 U.S.C. § 1921(a)"); *E.E.O.C. v. Yellow Freight System, Inc.*, No. 98 C 2725, 1999 WL 965854, at * 2 (N.D. Ill. Oct. 14, 1999) (the amount recoverable for

service of process by a private service may not exceed the amounts charged by the marshal service).[14]

The standard rate for the Marshal Service to serve a subpoena is $40.00 for the first two hours and $20.00 per hour thereafter, in addition to $0.31 per mile. *See Yellow Freight System,* 1999 WL 965854, at * 2. As defendants point out, the plaintiff's invoice does not break down "how long such service took" or where service was accomplished. The Court is, therefore, left to speculate how long – over the standard two hour, $40.00 fee – the process server spent trying to effect service. Moreover, the Court cannot calculate how far the process server had to travel and thus how much to award for mileage. Although $50.00 might be reasonable if the process server traveled some distance over a two-hour period, without more evidence awarding $50.00 would require the Court to engage in guesswork, and the Court will not award fees on that basis. However, it is clear that the minimum cost had service been achieved by the Marshal Service would be $40.00. Thus we reduce plaintiff's request for costs of service on the Cohen Group from $50.00 to $40.00.

### 3.     Fees of the Court Reporters.

Plaintiff requests $5,974.68 for court reporters' fees incident to the taking of depositions and $4,754.25 for the reporters' fees in preparing the trial transcripts. Under Section 1920, plaintiffs may recover costs for copies necessarily obtained for use in the case. "The phrase 'for use in the case' refers to materials actually prepared for use in presenting evidence to the court." *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1584 (7th Cir. 1990) (quoting *E.E.O.C. v. Kenosha Unified School*

---

[14]Plaintiff cites *Great Lakes Dredge & Dock Co. v. City of Chicago,* No. 94 C 2579, 2000 WL 1898533, at *4 (N.D. Ill., Sept. 18, 2000), for the proposition that the Marshal Service rate does not act as a cap on reimbursement for private service costs. However, we are bound by the Seventh Circuit's ruling in *Collins,* which was not brought to the attention of the court in the *Great Lakes* case.

*Dist. No. 1*, 620 F.2d 1220, 1227-28 (7th Cir. 1980)). To substantiate this claim, the plaintiff includes a summary of the costs of deposition and trial transcripts, along with receipts which include the number of pages, the per page amount, and the dates of when the depositions took place.

Defendants object to the per page amount for the original transcripts and the per page amounts for the first copy of the transcripts to each party. In addition, the defendants object to the plaintiff's request for charges related to "condensed transcripts" (Defs.' Opp. at 5), ASCII diskette copies (*Id.* at 6), shipping and handling charges (*Id.* at 6), photocopying of exhibits used at the depositions (*Id.* at 7), and binding and processing of the depositions (*Id.* at 8). Based on these objections, the defendants seek to reduce the sum that plaintiff requests by $1,437.68 with regard to deposition transcripts (*Id.* at 8). With regard to the trial transcripts, the defendant seeks to disallow the costs completely or, in the alternative, to reduce the charges by $934.45 (*Id.* at 11). The Court will address each of these contentions in turn.

a.     *Deposition Transcripts.*

Deposition transcript charges are taxable if the deposition appears reasonably necessary "in light of the facts known at the time of the deposition." *M.T. Bonk Co.*, 945 F.2d at 1410. *See also Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 455 (7th Cir. 1998) (issue is whether deposition was "reasonably necessary" to the case at the time it was taken). A court is to presume that deposition transcripts are reasonable and necessary unless the defendants prove otherwise. *Movitz*, 982 F. Supp. at 575. Here, the defendants do not dispute that the depositions of the respective witnesses were necessary or reasonable; their objections stem from the amount of costs that plaintiff requests (Defs.' Mem. at 4). Under Local Rule 54.1(b), the taxable cost of deposition transcripts "shall not exceed the regular copy rate as established by the Judicial Conference of the United States

and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court." *See also Cengr*, 135 F.3d at 456 (judicial rates apply to private as well as official court reporters); *Moriarty*, 1999 WL 162792, at *1. The Judicial Conference has established a maximum rate of $6.00 per page for an hourly transcript; $5.00 per page for a daily transcript; $4.00 per page for an expedited transcript; $3.00 per page for an original transcript; and $0.75 per page for the first copy of a transcript furnished to each party. *See Cengr*, 135 F.3d at 456; *Moriarty*, 1999 WL 162792, at *1.[15]

 (1) Full-Sized Transcripts.

The defendants argue that the cost of the original transcripts should be reduced using the judicial conference rates. The Court agrees, and therefore will award for each original transcript the actual court reporter charge or $3.00 per page, for originals and $.75 per page for copies, whichever is less. The Court awards the plaintiff (a) $798.00 for the original transcript of Joseph Fraval (266 pages x $3.00/page), (b) $415.95 for the original transcript of Arnold Berkovitz (141 pages x $2.95/page), (c) $159.30 for the original transcript of Stanley Cohen (54 pages x $2.95/page), (d) $81.75 for the copy of the transcript of Manfred Bick (109 pages x $.75/page), (e) $87.00 for the

---

[15]In *Cengr*, the Seventh Circuit summarized the judicial conference rates applicable to various types of transcripts.

| Type of Transcript | Original | First Copy to Each Party | Each Additional Copy to the Same Party |
|---|---|---|---|
| Ordinary Transcript | $3.00 | $0.75 | $0.50 |
| Expedited Transcript | $4.00 | $0.75 | $0.50 |
| Daily Transcript | $5.00 | $1.00 | $0.75 |
| Hourly Transcript | $6.00 | $1.00 | $0.75 |

These rates are still used and applied by district courts in the Northern District of Illinois. *See, e.g., AA Sales & Assoc., Inc. v. JT&T Prods. Corp.*, No. 98 C 7954, 2001 WL 641498, *5 (N.D. Ill., June 4, 2001) (citing VI Judicial Conference of the United States, Guide to Judiciary Policies & Procedures, Court Reporters Manual Ch. 20, pt. 20.3 (1998).

copy of the transcript of John Wojciechowski (116 pages x $.75/page), (f) $495.00 for the combined original transcripts of Hans Ager, Mitchell Godfrey, and Robert Maxey (52 pages x $3.00/page for Mr. Ager, 77 pages x $3.00/page for Mr. Godfrey, 36 pages x $3.00/page for Mr. Maxey), (g) $585.00 for the combined original transcripts of Suzanne Linehan and Robert Edmonston (195 pages x $3.00/page), (h) $801.00 for the combined original transcripts of Donald Lee Smith and Mary Lynn Parke (185 pages x $3.00/page for Mr. Smith, 82 pages x $3.00/page for Ms. Parke), and (i) $135.00 for the original transcript of the continued testimony of Joseph Fraval (45 pages x $3.00/page). Thus, the Court awards a total of $3,558.00 for the deposition transcripts of the aforementioned witnesses.

(2) Condensed Transcripts/ASCII Diskettes/Deposition Exhibit Photocopies.

Defendants further argue that the costs such as condensed transcripts, ASCII diskettes, and photocopying of exhibits during the depositions are not taxable as costs under Section 1920 (Defs.' Mem. at 6-7). Plaintiff now concedes that a reduction for these costs is appropriate (Pl.'s Reply at 1-2), and with good reason. The items listed above were prepared for the convenience of the plaintiff and not for the purpose of presenting evidence to the Court; they are, therefore, not recoverable. *See Rizzo*, 1996 WL 84235, at *4 ("[c]opies of court filing for a party's personal use, extra copies of filed papers and correspondence, and copies of cases are not recoverable"); *Yellow Freight System*, 1999 WL 965854, at *3 (court found deposition transcript contained on a computer diskette supplementary to the printed deposition and was therefore only a convenient means to preserve the testimony of the witness). Thus, the Court will eliminate from the plaintiff's costs the

total additional costs of $833.78 related to the condensed deposition transcripts ($115) (Defs.' Opp. at 5-6); ASCII diskettes ($95) (Defs.' Opp. at 6); and deposition exhibit photocopies ($623.78)[16]

    (3)    Shipping and Handling/Court Reporter Attendance/Binding and Processing.

The defendants further dispute plaintiff's charges for the costs of shipping and handling ($195.10), binding and processing ($36.00), and the attendance charge of the court reporter at the deposition of Stanley Cohen ($75.00) for a total of $231.10 (Defs.' Mem. at 6-8). However, fees incidental to a deposition and for court reporter attendance at depositions are generally recoverable. *See Finchum v. Ford Motor Company*, 57 F.3d 526, 534 (7th Cir. 1995) (where court labeled *per diem* costs and delivery costs of court reporter "incidental" to taking of depositions and award of costs to prevailing party was not abuse of discretion by district court); *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 852 F.2d 936, 944 n.10 (7th Cir. 1988) (district court has discretion to award miscellaneous deposition charges); *Winery v. City of Chicago*, No. 98 C 1208, 2000 WL 1222152, at *3 (citing *Finchum*, 57 F.3d at 534) (where recovery of costs by the prevailing party associated with the delivery of a deposition was allowed).

With respect to shipping and handling charges (related to delivery of deposition transcripts, copies and originals) totaling $195.10, defendants contend that such fees and charges are not specifically provided for by Section 1920 and are "disallowed on the grounds that such expenses are generally considered overhead, or part of the cost of operating a law firm" (Defs.' Mem. at 6 (citing *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1144 (7th Cir. 1994)). The plaintiff claims that such costs are reimbursable because they are "reasonably incident to the taking of depositions" (Pl.'s Reply at 2 (citing cases above)). After review of these cases, the Court finds that *Downes*

---

[16]$562.38 (copies of plaintiff's exhibits) + $61.40 (additional copies of defendants' exhibits) = $623.78.

does not stand for the proposition that shipping and handling expenses incidental to depositions are not taxable costs that may be awarded under Section 1920. Conversely, the *Finchum* court recognized costs "incidental to the taking of depositions, such as the *per diem* and delivery charges (or shipping and handling) by the court reporter may be awarded, even though "not specifically mentioned in the statute." 57 F.3d at 534 (citing *SK Hand Tool Corp. v. Dresser Indus. Inc.,* 852 F.2d 936, 944 n.10 7th Cir. 1988) *cert. denied,* 492 U.S. 918 (1989)). The Court here holds that plaintiff is entitled to recover fees for shipping and handling in the amount of $195.10.

With respect to binding expenses, the defendants simply argue that such charges are not specifically provided for by Section 1920 and are "presumably" included in the per page transcription rates established by the judicial conference (Defs.' Mem. at 8). In the absence of any proof to substantiate that presumption, the Court agrees with the plaintiff that this modest cost is a reasonable incident of a deposition. The Court therefore finds that $36.00 in binding expenses (twelve transcripts @ $3.00 per transcript = $36.00) will be awarded.

Finally, the defendants challenge only one *per diem* court reporter charge: that of the court reporter who reported the deposition of Stanley Cohen ($75.00). The defendants argue that the invoice "provides no basis upon which to examine the reasonableness of the hourly charge" (Defs.' Mem. at 8). The invoice reflects a charge of $75.00 based on a minimum attendance fee (Pl.'s Bill, Ex. 2).[17] The Cohen transcript does not disclose what time the deposition ended, so we cannot with

---

[17]The plaintiff attached all of its supporting documentation to the Bill without exhibit numbers or tabs. For convenience (and to track plaintiff's apparent intention as evidenced by its reference to exhibit numbers in its Bill), the Court will identify each document chronologically by an exhibit number representing each document in the order in which they are stapled together (*e.g.,* Ex. 1, 2, 3, 4 etc.).

48

precision determine the hourly rate that would result from this minimum fee. However, the Court does not find it inappropriate for a court reporter to charge – and for plaintiff in turn to recover – a minimum fee for a short deposition. The Court will therefore include in taxable costs the $75.00 fee for the court reporter on the Cohen deposition.

Thus, the Court awards the plaintiff $3,864.10 to recover the charges necessary and reasonable to the depositions of the respective witnesses.

b.    *Trial Transcripts.*

The plaintiff requests a total of $4,754.25 for expedited and hourly transcripts of: the March 2, 2001 pre-trial hearing;[18] the original transcripts (and one copy) from the proceedings at trial on of March 5-8, 2001;[19] 43 pages of hourly transcript from March 8, 2001 trial proceedings;[20] and the original transcript from the proceedings at trial on March 9, 2001.[21]

Section 1920 states that the fees of the court reporter for all or any part of the stenographic transcript are taxable if "necessarily obtained for use in the case." This phrase has been interpreted to mean that "the materials were actually prepared for use in presenting evidence to the court." *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1584 (7th Cir. 1990). In addition, "[e]xcept as otherwise ordered by the court, only the cost of the original of such transcript or deposition together with the cost of one copy each where needed by counsel . . . shall be allowed." *Cengr*, 135 F.3d at 455.

---

[18] 97 pages @ $4.00/page = $388.

[19] 3/5 Pretrial = 116 pages @ $4.00/page = $464.00; 3/5-3/8 Trial = 796 pages @ $4.00/page = $3,184.00 *plus* 43 pages @ $0.75/page = $32.25 (1st Copy) or $3216.25.

[20] 43 pages @ $6.00/page = $258.00.

[21] 107 pages @ $4.00/page = $428.00.

Defendants do not challenge the need for trial transcripts as reasonably necessary for the preparation of trial and/or post-trial motions; instead, defendants level specific challenges to certain costs related to each transcript at issue (Defs.' Mem. at 9-11).

(1)     March 2, 2001 Transcript.

The plaintiff requests $388.00 as the transcription cost of the March 2, 2001 proceedings (Pl.'s Reply at 3). The defendants challenge the reasonableness of this charge on the basis that it reflects an expedited rate ($4.00 per page versus the standard $3.00 per page). In particular, the defendants contend that an expedited transcript from the March 2 proceedings was not necessary for post-trial motions, which were not due to be filed until March 26 (Defs.' Mem. at 9-10). Moreover, defendants contend that the higher charge for an expedited transcript is not warranted where plaintiff has failed to explain the relevance or necessity of this particular transcript to the post-trial filings (*Id.*). In its reply, the plaintiff claims that this transcript was used not for post-trial motions, but for trial itself. Because the cost of pre-trial and trial transcripts is generally recoverable, *Weeks v. Samsung Heavy Indus. Co.,* 126 F.3d 926, 945-46 (7th Cir. 1997), and because this was a proceeding that limited and clarified the issues that would be addressed at trial, *Movitz,* 982 F.Supp. at 575 ("[a] prevailing party can recover costs for transcripts of pre-trial hearings if the case is complex, and the pre-trial hearings limited or clarified the issues"), plaintiff argues that an expedited transcript was reasonably necessary because trial was scheduled to commence on March 5, three days later (Pl.'s Reply at 3). The Court finds that the March 2 pretrial transcript was obtained "for use in the case," as contemplated by Section 1920, *McIlveen,* 910 F.2d at 1584, and given the short time-frame between the hearing and trial, an expedited copy was warranted. Thus, the transcript cost of $388.00 will be awarded in full.

(2)     March 5-9, 2001 Transcripts.

The plaintiff seeks reimbursement of $4,366.25 in costs for the remaining trial transcripts ($4,754.25 - $388.00 for the March 2 transcript). The plaintiff argues that it needed these transcripts to prepare and respond to post-trial motions (Pl.'s Reply at 4-5). We agree.

The Court also finds that the expedited transcript of trial testimony by Dr. Mary Parke on March 8 was reasonable, as that was specifically used in closing argument the next day. Thus, we award expedited costs for that transcript at the hourly rate. However, the cost of the "first Copy" price of the 43 pages of Dr. Parke's trial transcript from March 8th will be excluded from the total award ($0.75/page * 43 pages), because the plaintiff had the original transcript for post-trial motions. Because the Court has awarded the cost of this original transcript (at the hourly rate), we will exclude the cost of the first copy ($32.35) from the total award.

As for the costs sought for the other trial transcripts, plaintiff has made a sufficient showing that expedited delivery was needed. The transcripts were not ordered until after trial, when plaintiff knew they would be needed for post-trial motions and, of more immediate concern, motion practice directed at the scope of the injunction against defendants. On March 12, 2001, the Court ordered motions directed to the injunction to be filed by March 26, 2001, and the transcripts would be reasonably necessary for that briefing. Moreover, the Court notes that the Court reporter's bills show that expedited delivery only insured that the transcripts would be delivered within seven days – or by March 20 or 21. To order the transcripts on an ordinary-delivery basis may have resulted in there

not being received until after the deadline for briefing the injunction issue. Thus, the Court awards the costs of these transcripts at the expedited ($4.00/page) rate.[22]

Thus, the Court awards the plaintiff $388.00 for the original transcript of the March 2, 2001 proceeding,[23] and $4,334.00 to cover the original transcription costs of the March 5-9, 2001 proceedings.[24]

### 4. Fees and Disbursements for Witnesses.

The plaintiff requests a total of $921.20 for its witnesses expenses including: witness fees, travel expenses, and subsistence allowances (Pl.'s Mem. at 4). For the reasons that follow, the Court awards these costs in full.

*a. Witness Fees.*

A prevailing party is generally entitled to witness fees. 28 U.S.C. § 1920(3). A witness in attendance in court or before any person authorized to take their deposition shall be paid an attendance fee of $40.00 per day for each day's attendance. 28 U.S.C. § 1821(b); *see, e.g., Robinson v. Burlington Northern Railroad Co.*, 963 F. Supp. 691, 693 (N.D. Ill. 1997). Defendants do not dispute the witness fees for Cohen, Parke or Smith. Thus, the Court awards plaintiff $120.00 for the appearance of these three witnesses.

---

[22]Defendants contend that the transcription costs of the March 9 hearing are not recoverable because the invoice "fails to identify what was transcribed" (Defs.' Mem. at 10). In its reply, the plaintiff attaches the first and last pages of the March 9th transcript, prepared by B. Lara, showing the date transcribed and the number of pages (107) (Pl.'s Reply at 4, Ex. A). The invoice submitted for $428.00 indicates that 107 pages were transcribed. Because the number of pages is consistent and because March 9 is the only day of trial with a missing invoice, the Court can reasonably conclude by process of elimination that the March 9 transcript is represented by the invoice requesting payment of $428.00. Like the other invoices, this invoice indicates, in handwriting, that it was paid by the plaintiff's law firm.

[23]97 pages x $4.00/page (March 2, 2001 proceedings) = $388.00.

[24]116 pages x $4.00/page (March 5 (p.m.), 2001 trial transcript) = $464.00
796 pages x $4.00/page (March 5 (a.m.)-8 (excluding Parke, 2001 trial transcript) = $3,184.00
43 pages x $6.00/page (March 8 (Parke), 2001 trial transcript) = $258.00
107 pages x $4.00/page (March 9, 2001 trial transcript) = $428.00

Defendants do dispute the attendance costs of Messrs. Wojciechowski and Edmonston, contending that plaintiff offered no evidence that these witnesses were actually paid. The Court finds that this argument is without merit. The invoices from these witnesses submitted by plaintiff as Exhibit 4 show that they were paid by plaintiff an hourly rate for their time, which far exceeds (and subsumes) the $40.00 attendance fee. Defendants cite no authority that a party cannot recover statutory witness fees merely because it has paid the witness in excess of that amount. The Court finds that plaintiff is entitled to recover $40.00 each in attendance fees for Messrs. Wojciechowski and Edmonston.

b.      *Travel and Subsistence Allowances.*

The plaintiff requests travel and subsistence allowances for their witnesses totaling $721.20 ($921.20 - $200.00 for 5 witnesses at $40.00 per witness), all of which is attributable to Mr. Edmonston's attendance at trial. Plaintiff seeks to recover Mr. Edmonston's charges for ground transportation ($194.70); flight transportation ($365.50); and a subsistence fee ($161.00). For the reasons that follow, the Court awards the plaintiff a portion of Mr. Edmonston's travel and subsistence allowance expenses.

Under 28 U.S.C. § 1920, a prevailing party is entitled to travel and subsistence expenses, so long as the witness "utilize[s] a common carrier and the most economical rate reasonably available." In its reply brief, the plaintiff has provided receipts that demonstrate compliance with Section 1920 (Pl.'s Reply at 6 (Exs. C & D)). *See Cefalu v. Village of Elk Grove*, 1998 WL 409690, at *11 (N.D. Ill., July 15, 1998) (disallowing travel expenses for which receipts were not provided), vacated in part (not relevant here) by 211 F.3d 416, 429 (7th Cir. 2000); *Webcraft Technologies, Inc. v. The*

*Lehigh Press, Inc.,* 1992 WL 59110, at * 2 (N.D. Ill., March 13, 1992) (witness expense reports, submitted without receipts or ticket stubs, insufficient for bill of costs).

The Court finds that the $365.50 cost of the flight taken by Mr. Edmonston was reasonable. Mr. Edmonston took ground travel from Wayland, Massachusetts to Manchester, New Hampshire in order to board a substantially less expensive flight to Chicago (Pl.'s Reply at 6). But we are surprised that the cost of a one-hour ride to go from Wayland to Manchester could cost $194.70 (Pl.'s Reply, Ex. C). In the absence of proof that this was the "most economical rate reasonably available" for ground transport, the Court disallows that cost.

The plaintiff is entitled to recovery of the per diem cost of $161.00 for Mr. Edmonston's stay in Chicago. That amount is reasonable, and in fact is approximately the $159.00 cost of Mr. Edmonston's hotel stay alone -- which is not unreasonable for a hotel in Chicago. *See, Robinson,* 963 F.Supp. at 693 (holding that prevailing party was entitled to $161.00, the *per diem* allowance for Chicago according to the Clerk of the Court, pursuant to Section 1321(d)). Accordingly, the Court awards the plaintiff an additional $526.50 ($365.50 + 161.00), in addition to the $200.00 for the witness fees of Cohen, Parke, Smith, Wojciechowski and Edmonston for a total award of $726.50 for witness fees and disbursements.

**5. Exemplification Expenses.**

The plaintiff seeks reimbursement for exemplification expenses totaling $16,687.02 (Pl.'s Bill at 5; Pl.'s Reply at 11). These expenses include the costs associated with the preparation of exhibits and demonstrative aids for trial by TrialGraphix ($11,989.12) (*Id.*); the edited video of the

plant inspection and 3 copies (plus shipping and handling) ($531.00) (Pl.'s Reply at 7); and rental of the audio visual equipment ($4,166.90) (Pl.'s Bill Ex. 27).[25]

The Seventh Circuit has held that "[s]o long as the means of presentation furthers the illustrative purpose of an exhibit, we believe it is potentially compensable as exemplification." *Cefalu*, 211 F.3d at 428. The defendant contends that the costs paid to TrialGraphix should be denied, because the plaintiff did not seek prior approval from the Court for this expense (Defs.' Mem. at 14). In *Cefalu*, the Seventh Circuit did not adopt the "prior approval" approach of an earlier Seventh Circuit case, *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir. 1975), but instead adopted a much broader approach to exemplification expenses by defining such expenses as encompassing not only graphs and charts, but also sophisticated multi-media presentations, allowing for costs that include expenses for use of recent technological advances. 211 F.3d at 428-29. However, the Seventh Circuit cautioned that while an item may qualify as exemplification, district courts must still determine whether it was "necessarily obtained for use in the case" pursuant to Section 1920(4).

For the reasons given below, exemplification costs will be awarded in the amount of $14,994.53.

a.      *Videotape.*

Plaintiff seeks to recover $531.00 related to the videotape of a plant inspection of ZR Energy facilities, including the cost of three copies, shipping and handling, and editing. This $531.00 figure

---

[25]In its reply brief, the plaintiff seeks to amend its Bill *instanter* to include the amount of $1,043.80 for exemplification costs to TrialGraphix, which was posted on a second invoice and discovered after the first Bill was submitted to the Court. Defendants have filed no motion opposing the addition of this request, and has not challenged it on the merits. The Court will grant this request because the exhibits listed on this invoice were reasonable and necessary for use in the trial.

includes $140.00 for editing the tape, and $76.50 for two VHS copies and their respective shipping charges. Although the plaintiff was responsible for having the videotape prepared for trial, the defendants, rather than the plaintiff, actually used the videotape during the trial (Pl.'s Reply at 7). Thus, defendants can hardly dispute that the video was necessary and that it was prepared "for use in the case." However, the defendants seek a reduction of the allowable costs to eliminate the $140.00 for editing, and the $76.50 attributable to two copies.

The Court finds that the editing of the video was necessary in order to delete excerpts that were not pertinent and/or redundant, and to reveal only relevant information to the jury. However, the plaintiff has offered no explanation as to why it was reasonable or necessary to have more than one copy made, and the Court perceives none. Consequently, the $76.50 in costs associated with copying, shipping and handling of two of the three copies of this video was not reasonably necessary for use at trial, but instead appear to have been incurred for plaintiff's attorneys' convenience. Thus, according to the Court's calculations, the plaintiff would be entitled to $454.50 ($531.00-$76.50) associated with the videotape.[26]

b.    *Enlarged Trial Exhibits.*

The plaintiff seeks $11,989.12 in expenses for its enlarged trial exhibits, which included enlarged reproductions of the contract language and color-coded, side-by-side descriptions of the parties' ZMP manufacturing processes as compared to the process disclosed in the Eagle-Picher Report. "To evaluate the necessity of a particular type of exemplification, the Court may consider

---

[26]In its reply, the plaintiff only requests $391.50. This number must be a typographical error, given the plaintiff's clear intent to seek recovery of "the costs of editing the videotape for the jury" (Pl.'s Reply at 7). As indicated, the total cost of the video, as represented by the invoice submitted in the original bill of costs, was $391.50. The cost of editing was $140.00. The Court finds that plaintiff is entitled to an award of $454.50, despite its apparent typographical error.

'whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed.'" *Leggett*, 149 F. Supp.2d at 397 (quoting *Cefalu*, 211 F.3d at 428). The defendants make two arguments for reduction of the exemplification costs plaintiff seeks.

*First*, defendants argue that the Court should not allow recovery because the large exhibits were redundant given that the witnesses and jurors each had copies of the exhibits and unnecessary since not all of the enlarged exhibits were used and only two of them were permitted to go to the jury room during deliberations (Defs.' Mem. at 15). While the jurors and witnesses had 8" x 11" copies of the exhibits, the ultimate outcome in the case may have hinged upon the jury's understanding of critical language in certain documents, and upon the specific similarities and/or differences between the two companies' procedures (and that of the Eagle-Picher Report) exemplified by PX 132, 134 and 135. "Enlargement costs are taxable if the exhibits were 'necessary to the understanding of an issue and a material aid to the jury ... [and not] merely illustrative of expert testimony, other adequate evidence, or argumentative.'" *Robinson*, 963 F. Supp. at 696 (quoting *Endress + Hauser, Inc. v. Hawk Measurements Sys. Pty, Ltd.*, 922 F. Supp. 158, 162 (S.D. Ind. 1996)). The Court finds that the enlarged trial exhibits here likely were helpful to the jury in understanding the evidence. In order to accurately identify the exact step where a particular chemical reaction occurred, the plaintiff's enlarged exhibits helped the Court (and thus presumably the jury) understand the points being made. Conversely, pointing to a single page in a large trial notebook with multiple pages of exhibits would not have effectively shown to the jurors the most important features of the chemical reaction. *See Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble*, 924 F.2d 633, 644 (7th Cir. 1991) (court, in its discretion, allowed for recovery of costs associated with graphs, photos, and

charts which allowed the jury to understand complex issues involved in the case). Thus, the Court rejects defendants' redundancy argument.

*Second*, defendants argue that the Court should not allow recovery of the amounts paid to TrialGraphix for plaintiff's enlarged demonstrative illustration boards because the TrialGraphix invoice attached to the Bill does not provide any detailed information regarding what services it performed, what documents it enlarged, or the per item charge. Instead, "the document merely provides a total balance figure (including tax) and a recitation that such balance relates to the claim (Defs.' Mem. at 15). However, the plaintiff has rectified that problem in its reply, which included detailed receipts and charts showing the exact nature of the service provided by Trial Graphix (Pl.'s Reply at 7-11 (Ex. F)). Defendants have not sought to file any supplemental document challenging the reasonableness of these figures.

Therefore, the Court awards the plaintiff $11,989.12, the costs billed by TrialGraphix for the exhibits used in court.

c.    *Audiovisual Equipment.*

Plaintiff seeks an award of $4,166.90 for the cost of certain audiovisual equipment. Defendants raise three arguments in seeking to reduce that amount.

*First*, defendants argue that any amount that the Court deems reasonable must be reduced by half, because prior to trial the parties agreed to split the costs of the audiovisual equipment (Defs.' Mem. at 15). Plaintiff agrees that there was a pretrial agreement to split those costs, but asserts that the agreement did not trump the right of whoever prevailed at trial to recover the costs of the audiovisual equipment – and plaintiff seeks to recover the full amount, since it fronted the money for the audiovisual equipment and defendants paid none of their share. Defendants have offered no

documentation of the specific terms of this cost-sharing agreement, and in the absence of specific proof, the Court will not hold that the agreement supersedes the plaintiff's right to recover reasonable costs for the audiovisual equipment as the prevailing party under Rule 54.

*Second*, plaintiff suggests that if the agreement did not foreclose plaintiff from seeking the full reasonable costs of the audiovisual equipment, than plaintiff should nonetheless be barred from recovering because it did not seek advance authorization from the Court for the expenditure (Defs.' Mem. at 15-16). As we explained above, the recent Seventh Circuit decision in *Cefalu*, 211 F.3d 416, did not require that a party seek prior approval as a condition to later seeking recovery of costs for technological aids, and so the Court does not impose that requirement either.

*Third*, plaintiff argues that the costs must be disallowed or reduced because plaintiff has failed to explain the necessity of renting the audiovisual equipment (Defs.' Mem. at 15-16). That argument is not one that defendants gracefully can make, since they agreed in advance to share the costs of the audiovisual expenditures, and defendants do not argue that they were unaware of what equipment plaintiff intended to rent or how much it would cost. Indeed, defendants themselves used certain of the equipment (the TV monitor, the VHS player, and the flat paneled monitors) to display two video tapes to the jury. Nonetheless, several other items of high-priced technological equipment served no purpose at trial other than to take up space in the courtroom. Accordingly, the Court reduces the amount that it will award as reasonably necessary costs for the audiovisual equipment to the rental charge for the TV-monitor, VHS player and flat paneled monitor (collectively,

$2,060.00); six percent tax on that rental amount ($123.60); plus a portion of the delivery, setup, pickup and technical support charged for the equipment ($367.31), for a total of $2,550.91.[27]

### 6. Copies of Notebooks and Exhibits.

Plaintiff seeks $2,110.88 for copies of trial exhibits and materials "necessarily obtained for use in the case." 28 U.S.C. § 1920(4). The defendants argue that plaintiff's request is "fatally flawed" because the plaintiff did not provide "detail as to the actual documents photocopied." Plaintiff, however, specified the type of items copied: ten sets of notebooks of exhibits (eight for the jurors, one for the court, and one for the witness). Each notebook contained copies of both the plaintiff and defendant's exhibits, and the plaintiff notes that the costs for in-house copies are not being sought.

The prevailing party is not required to submit a bill of costs so detailed as to make it economically impossible to recover photocopying costs, but where a court is unable to determine whether the copies in question were reasonably necessary for use in the case, the claim for costs should be denied. *American Automotive Accessories, Inc. v. Fishman*, 991 F. Supp. 995, 997 (N.D.Ill. 1998); *Place v. Abbott Laboratories*, No. 94 C 5491, 1999 WL 569580, at *3 (N.D. Ill. July 30, 1999) (citing *Moore v. The University of Notre Dame*, 22 F. Supp. 2d 896, 914 (N.D. Ind. 1998)). The burden is on the party seeking reimbursement for photocopying costs to show that the photocopied items were necessary; if that party fails to meet the burden, the court should not award costs for those items. *Place*, 1999 WL 569580, at *3 (citing *Lawyer v. 84 Lumber Co.*, No. 96 C

---

[27]The total delivery, setup, pickup and technical support charge was $600.00. The Court has calculated the amount of this support charge to be awarded as costs by determining the percentage of the awarded equipment costs to the total equipment costs incurred ($2,060.00 divided by $3,365.00), and applying that same percentage to the support costs incurred.

0356, 1998 WL 111703, at *6 (N.D. Ill. Mar. 12, 1998)). Plaintiff can recover costs only for copies necessarily obtained for use in the case. "The phrase 'for use in the case' refers to materials 'actually prepared for use in presenting evidence to the court.'" *McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990) (quoting *E.E.O.C. v. Kenosha Unified School Dist. No. 1*, 620 F.2d 1220, 1227-28 (7th Cir. 1980)). Courts have held that Section 1920(4) allows the prevailing party to recover costs incurred in copying exhibits submitted to the courts as well as those used at trial. *Movitz*, 982 F. Supp. at 577 (citing *Finchum*, 57 F.3d at 534; *M.T. Bonk Co.*, 945 F.2d at 1410).

In this case, the Court required that trial notebooks containing the numerous pre-admitted exhibits be given to each juror. The exhibit books were used extensively by both parties throughout the trial, and facilitated the presentation of evidence. The Court finds that these documents were clearly identified, reasonable and necessary to the jury's understanding of the issues, and made for use in the case. Thus, recovery of reasonable costs for these copies is "clearly allowable." *Finchum*, 57 F.3d at 534.

The plaintiff has submitted invoices setting forth the per page copying charge, and a breakdown of the number of copies, including black and white, color and oversized. These invoices list as costs for the copies amounts ranging from $0.20 to $1.50 (Pl.'s Bill, Ex. 37). The Court finds the costs charged for these copies is excessive and thus unreasonable; courts in this district have held that photocopying charges in the range of $0.10 to $0.15 is reasonable. *See Jennings*, 1998 WL 704106, at *2 (in-house copies at eleven cents per page reasonable.); *American Automotive*, 991 F. Supp. at 998 (in-house copy cost at $.15 per page is reasonable). But, the Court is mindful of the fact that many of plaintiff's copies were color or oversized copies and that the outside print shops charged more than $0.15 for these copies. The Court finds that these copies were not reasonably

necessary for use in the trial: the enlarged, color exhibits greatly aided the jurors' understanding of the case as it was presented, but additional *color* copy prints and *oversized* copy prints were not necessary within the individual binders. The need for binding and tabs was reasonably necessary to organize the voluminous information contained in the notebooks and to refer to the exhibits quickly during testimony. Thus, the Court will award the plaintiff costs associated with the copies at a rate of $0.15 per copy, along with the incidental charges for binding and tabs, which the Court finds necessary and reasonable. The plaintiff is therefore awarded a total of $1,604.94 as reimbursement for costs associated with the trial exhibits and notebooks.

* * *

Based on the foregoing analysis, the Court awards plaintiff costs totaling $26,102.07, which includes the following:

| | |
|---|---|
| Fees of Clerk and Marshal: | $ 190.00 |
| Fees of the Court Reporters: | 8,586.10 |
| Witness Fees/Disbursements: | 726.50 |
| Exemplification Expenses: | 14,994.53 |
| Trial Exhibit Notebooks: | 1,604.94 |

## CONCLUSION

For the reasons set forth above:

(1) Defendants' motion for a judgment as a matter of law or, alternatively, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110) is denied;

(2) Plaintiff's motion to amend the judgment to include prejudgment and post-judgment interest (doc. # 144) is granted in part. The judgments against ZR Energy, Mr. Fraval and Mr. Berkovitz on the trade secret claim are increased to $139,667.88, $2,133.16 and $4,266.33, respectively, to include prejudgment interest to March 12, 2001. Post-judgment interest shall accrue on the judgments against ZR Energy and Mr. Berkovitz at the rate of $16.13 and $.3980 per day, respectively, from March 12, 2001. In all other respects, the motion is denied; and

(3) Plaintiff's bill of costs is granted in part and denied in part. Plaintiff is awarded $26,102.07 in taxable costs under Rule 54(d).

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: September 14, 2001**